**Raymond REUDY and Kevin Hicks dba Advertising Display Systems, Plaintiffs,**

v.

**CLEAR CHANNEL OUTDOORS, INC., a Delaware corporation, et al., Defendants.**

Nos. C–06–5409 SC, C–02–5438 SC.

United States District Court, N.D. California.

Feb. 2, 2010.

Gerald Michael Murphy, Luce Forward Hamilton & Scripps LLP, San Francisco, CA, for Plaintiff.

Scott D. Baker, James A. Daire, Michele D. Floyd, Reed Smith LLP, Christine Marie Morgan, Crosby, Heafey, Roach & May, San Francisco, CA, for Defendants.

*ORDER RE: SPECIAL MASTER'S REPORT AND RECOMMENDATIONS RE: ATTORNEY'S FEES*

SAMUEL CONTI, District Judge.

The Special Master in the above matter has rendered his Report and Recommen-

dations dated January 28, 2010 and filed February 2, 2010.

The Court after having read, reviewed, and considered said report and recommendations, hereby approves and accepts the recommendations in the following particulars:

CBS Corporation is granted attorney's fees in the amount of $331,757.00 and costs in the amount of $8,324.00.

Miller Starr Regalia is granted attorney's fees in the amount of $167,571.14 and costs in the amount of $1,412.68.

Powell Goldstein is granted attorney's fees in the amount of $21,433.50 and costs in the amount of $19,863.25.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION BY SPECIAL MASTER RE: ATTORNEYS FEES

EUGENE F. LYNCH (Ret.), Special Master.

### INTRODUCTION

On December 11, 2007, the Federal District Court (Northern District of California) entered judgment in favor of Defendants CBS Corporation (CBS) and Patrick Roche (Roche) ("Defendants") and against Plaintiffs Raymond Reudy and Kevin Hicks dba Advertising Display Systems and ADS-1 ("Plaintiffs.") Defendant Roche thereafter moved for an order for attorneys' fees and costs pursuant to Federal Rules of Civil Procedure, rule 54(d), Northern District Local Rules, Rule 54–6, California Code of Civil Procedure Section 1021, and California Civil Code Section 1717.

Roche originally filed his motion for attorneys' fees on December 21, 2007, to comply with the timing requirements of the Federal Rules of Civil Procedure (Rule 54(d)(2)(B)) (claim for attorneys' fees must be filed no later than 14 days after entry of judgment.) CBS joined in the motion on December 26, 2007. However, on January 3, 2008, Plaintiffs filed a Notice of Appeal. On July 8, 2009, the Ninth Circuit affirmed the District Court's judgment, and the matter was transferred back to the District Court to address the issue of attorneys' fees. The parties thereafter filed supplemental briefing on the attorneys' fees issue.

At present, CBS seeks $331,757.00 in attorneys' fees and $8,324.00 in costs. Roche requested separate counsel, and retained Miller Starr Regalia to generally handle the case, and Powell Goldstein to specifically address the antitrust issues. Miller Starr Regalia seeks $263,968.20 in attorneys' fees and $1,412.68 in costs and Powell Goldstein seeks $125,361.74 in attorneys' fees and $19,863.25 in costs.

Defendants' motion is based on Paragraph 14.4 of the Parties' 2003 Purchase and Sale Agreement ("Agreement") and their alleged status as prevailing party[1] pursuant to the District Court's judgment. Paragraph 14 states: "The parties hereto agree that they shall pay directly any and all legal costs, which they have incurred on their own behalf in the preparation of this Agreement and other agreements pertaining to this transaction, and that such legal costs shall not be part of the closing costs. If either party is found in default of this Agreement and a final, non-appealable judgment is issued against said party for its default, then said party in default agrees to pay any and all costs arising as a result of said default, including reasonable attorneys' fees."

---

1. The final judgment of the Court makes it clear that Defendants are the "prevailing party." Plaintiffs basically concede this fact, raising no objection in their briefing or at the hearing.

The other paragraph applicable to the parties' dispute is Paragraph 15 of the Agreement, which included a "Release" and "Covenant not to Sue." The provision specifically provided that Plaintiffs would not "commence any litigation, arbitration or other proceeding" against CBS "that is similar in any way to the action instituted by [Plaintiffs] ... against Clear Channel."

A hearing was held on these issues at the JAMS offices in San Francisco, California on November 5, 2009, before the Honorable Eugene F. Lynch (Ret.), appointed as Special Master in this matter.

Plaintiffs raised essentially three objections as to why fees should not be granted:

(1) Plaintiffs sued Defendants in "tort" and therefore if Defendants believe they are entitled to attorneys' fees under the Agreement, they must bring a separate action in "contract." This first objection raises issues regarding the *scope* of the fee provision-i.e. the fee provision in the parties' Agreement provides for fees and costs when judgment is entered against a party based on a "default" and here judgment was entered based on Plaintiffs failure to state a cause of action, not default.

(2) Roche is not entitled to fees because he was not a party or signatory to the Agreement which contains the attorneys' fee provision; and

(3) Even assuming Defendants are entitled to attorneys' fees pursuant to the parties' Agreement, Plaintiffs' complaint included causes of action for public nuisance and antitrust, and because the statutes relating to these claims do not provide for an award of attorneys' fees to a prevailing defendant, these statutes "trump"

any private contract, and thus Defendants may not recover fees allocated to the defense of these causes of action.

Finally, assuming Defendants are entitled to fees and costs, Plaintiffs argue the amounts requested are "outrageous and entirely unreasonable."

### FACTS [2]

On December 15, 2003, Plaintiffs and CBS entered into a Purchase and Sale Agreement ("Agreement") whereby CBS purchased seven billboards from Plaintiffs for $2 million dollars. Paragraph 14.4 addressed "Legal Costs" and provided that "[i]f either party is found *in default* of this Agreement and a final, non-appealable judgment is issued against said party for its default, then said party in default agrees to pay any and all costs arising as a result of said default, including reasonable attorneys' fees." (Emphasis added.)

Also, as part of the Agreement, the parties entered into a "Release" and "Covenant not to Sue." Paragraph 15 stated that in further consideration of the execution of the Agreement, Plaintiffs released CBS and its' employees [3] "from any and all causes of action" relating to the maintenance and operation of its' outdoor advertising business in the San Francisco/Oakland Bay Area. The provision also specifically provided that Plaintiffs would not "commence any litigation, arbitration or other proceeding" against CBS "that is similar in any way to the action instituted by [Plaintiffs] ... against Clear Channel." Plaintiffs had previously sued Clear Channel pertaining to the operation and main-

---

**2.** A detailed statement of facts has been omitted because the Special Master believes the Court is already familiar with the history of this case. However, for the Court's convenience, a copy of the Special Master's previous "Report and Recommendation by Special Master," which recommended a dismissal of

Plaintiffs' complaint, is attached. The Report and Recommendation contains an exhaustive discussion of the background facts and procedure of this case.

**3.** Roche is an employee of CBS.

tenance of Clear Channel's advertising signs in the San Francisco area.

However, Plaintiffs did subsequently sue Defendants (as it had Clear Channel) alleging causes of action for intentional interference with prospective economic advantage, antitrust violations, public and private nuisance, and unjust enrichment. Each of Plaintiffs' claims related to CBS's operation and/or maintenance of its' outdoor advertising displays located in and around San Francisco. Defendants moved to dismiss based upon the release language in the parties' Agreement. The Court upheld the validity of the parties' Agreement, Plaintiffs' action was dismissed, and the dismissal was confirmed on appeal.

## DISCUSSION

### I.

*Defendants are entitled to Attorneys Fees & Costs pursuant to the Parties' Purchase & Sale Agreement.*

Plaintiffs argue judgment was not entered for a "default" pursuant to the Agreement, and therefore Defendants are not entitled to attorneys' fees pursuant to Civil Code Section 1717. Specifically, Plaintiffs argue that they brought an action against Defendants in *tort,* not breach of contract, and in order to collect fees and costs a *legal* action must be brought to enforce the Agreement.

In other words, Plaintiffs' argument goes to the *scope* of the Agreement and the fact that Section 1717 provides for fees only in actions *on a contract.* Section 1717 authorizes an award of fees "in any action on a contract, where the contract specifically provides that attorneys' fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party." At

the hearing, Plaintiffs argued that what Defendants achieved in this matter was "equitable" relief—i.e. specific performance of the Release and/or declaratory relief regarding the meaning of the Release. Citing *Stockton Theatres v. Palermo* (1954) 124 Cal.App.2d 353, 268 P.2d 799, Plaintiffs argue that Defendants' reliance on the fee provision is limited by what the provision provides, and here it is limited to fees in *legal* actions in which a *default* is found.

Defendants argue that Plaintiffs' assertion, that they are required to file a separate action based on breach of the Agreement to recover their fees, has no legal support. Defendants argue the language of the fee provision controls a fee award, and this provision is subject to the ordinary rules of contractual interpretation. Specifically, they argue that Plaintiffs "defaulted" on the Agreement by violating the Release and Covenant not to sue, and in support cite to the definition of "default" in Black's Law Dictionary.[4] Black's Law Dictionary defines default as "the omission or failure to perform a legal or contractual duty ... [or] to observe a promise." Defendants claim that here Plaintiffs "defaulted" when they failed to observe a promise not to sue Defendants as they had Clear Channel.

Defendants also argue that California courts permit the application of section 1717 when a party uses the agreement containing the fees provision as a defense to the underlying action, whether the action is based in contract or tort. Citing *Thompson v. Miller* (2003) 112 Cal.App.4th 327, 4 Cal.Rptr.3d 905, Defendants argue that when, as here, a plaintiff does not sue to enforce the agreement which contains the attorneys' fee provision at issue, the fees are still recoverable if the party seek-

---

**4.** Defendants also cite Merriam Webster at http://www.merriam-webster.com/dictionary/      default.

ing fees has prevailed within the meaning of the provision upon a type of claim contemplated within the scope of the provision. Finally, Defendants argue that in addition to section 1717, they are entitled to their attorneys' fees pursuant to Code of Civil Procedure sections 1021 and 1033.5.[5]

▇ The Special Master acknowledges that procedurally the action was not for breach of contract. Plaintiffs sued Defendants for intentional interference, nuisance, unjust enrichment and violations of the Sherman Act. Nor, technically, was there a finding of "default." The Court dismissed the action because Plaintiffs failed to state a cause of action. However, viewing what happened in this narrow fashion ignores, as Defendants argue, the substantive basis for the Court's decision, and the Special Master agrees with Defendants that the Agreement must be looked at in a *broader* fashion than argued by Plaintiffs. In other words, in granting the motion to dismiss, it was necessary to invoke the Agreement and find it disallowed the very actions Plaintiffs were attempting to bring, and in this sense was an action "on the contract" within the meaning of Section 1717.

▇ When interpreting attorneys' fees clauses, ordinary rules of contract interpretation apply (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 608, 71 Cal.Rptr.2d 830, 951 P.2d 399.) These principles do not require the kind of narrow reading of the fee provision that Plaintiffs assert. Thus, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertain-

able and lawful" (Civil Code section 1636.) The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other (Section 1641.) The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed (Section 1644.) A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates (Section 1647.)

Applying the above cited principles of contractual interpretation, leads to the conclusion that the Plaintiffs "defaulted" in their obligations to Defendants by suing them for the types of claims they expressly released and covenanted not to assert against them, as provided in paragraph 15. The Agreement even makes specific reference to Plaintiffs' case against Clear Channel, evidencing the parties' intent that Plaintiffs were agreeing not to sue Defendants in a similar way. However, that is exactly what they did. As stated above, a contract can be explained in reference to the circumstances under which it was made, and here the specific reference to the Clear Channel case shows Defendants were attempting to avoid a lawsuit over their billboards. This further suggests the parties intended that such action would constitute a "default" under the Agreement and as a consequence trigger the attorneys' fees provision.[6]

---

**5.** California Code of Civil Procedure section 1021 provides that the measure and mode of compensation of attorneys is left to the agreement of the parties. Section 1033.5(a)(10)(A) states that items allowable as costs under

section 1032 include attorneys fees when authorized by contract.

**6.** Furthermore, Plaintiffs' complaint alleged that the Agreement was void, thus requiring Defendants to defend the contract.

■ Therefore, while it is true that procedurally judgment was not entered on a "default", but because Plaintiffs "failed to state a cause of action," the substantive basis for this conclusion was that Plaintiffs could not state a cause of action because in the parties' Agreement they had promised not to sue Defendants for conduct related to CBS's sign business, that promise was enforceable pursuant to their Agreement, and therefore the Agreement barred Plaintiffs' claims. The *Thompson* case, cited by Defendants confirms this principle—i.e. the use of a contract as a defense to a tort action allows the prevailing party to invoke the fee provision in the contract (*Thompson v. Miller, supra,* 112 Cal.App.4th at p. 336, 4 Cal.Rptr.3d 905; *see also In re Baroff* (9th Cir.1997) 105 F.3d 439, 442–443.)[7]

The Special Master also agrees that contrary to Plaintiffs' argument, application of Section 1717 permits the requested relief. The primary purpose of section 1717 is to ensure mutuality of remedy for attorneys' fees under contractual attorneys' fees provisions. It was not intended that it limit the broad right of parties pursuant to section 1021 to make attorneys' fees agreements (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 610, 71 Cal.Rptr.2d 830, 951 P.2d 399.)

Rather section 1717 applies in situations in which a non-signatory to a contract requests the benefits of an attorneys' fees provision, which requires the court to examine the reciprocity of the provision. However, here CBS was a party to the contract and Roche was included in the list of releasees—i.e. they already were parties to the Agreement.

Finally, the *Stockton Theatres* case cited by Plaintiffs is distinguishable on its facts. There the parties entered into a lease agreement which provided for attorneys' fees if either party "defaulted"—i.e. failed to perform any term, covenant or condition under the lease. The defendant filed a claim for declaratory relief seeking to have the lease declared void, and although the court agreed, held he was not entitled to fees because the defendant did not allege a breach or default of the lease, but that it was invalid. In so holding the court applied standard rules of contractual interpretation to conclude that the declaratory relief action was not the type of action the parties intended to be covered by the term "default." Here, in contrast, as explained above, applying standard rules of contractual interpretation leads to a different result. As part of their Agreement Plaintiffs and Defendants entered into a Release which expressly stated that Plaintiffs were not to sue Defendants in the same way they had sued Clear Channel. Thus the Agreement reflects the parties' intent to avoid the type of litigation which did eventually ensue. In this sense Plaintiffs were in violation of the Agreement and the judgment against them constitutes a "default" under the Agreement.

Therefore, the Special Master concludes that Plaintiffs' action against Defendants constituted a "default" pursuant to the parties' Agreement, and therefore this argument is not a valid basis for defeating Defendants' claims for Attorneys' fees.

## II

*Roche is entitled to Attorneys Fees & Costs pursuant to the Agreement.*

Plaintiffs argue that Roche was not a party or signatory to the Agreement, but an employee of CBS, and therefore even if

---

7. Furthermore, Plaintiffs' suggestion that Defendants file a separate lawsuit for breach of the Agreement in order to recover fees and costs is unreasonable and procedurally unnecessary since it would result in the parties incurring additional fees and costs.

CBS is entitled to fees and costs, Roche cannot recover.[8] Plaintiffs claim that Roche cannot recover either under case law or any application of section 1717, citing *Topanga and Victory Partners v. Toghia* (2002) 103 Cal.App.4th 775, 127 Cal.Rptr.2d 104 and *Super 7 Motel v. Wang* (1993) 16 Cal.App.4th 541, 20 Cal. Rptr.2d 193.

Plaintiffs argue that section 1717 is inapplicable because it provides a reciprocal remedy for a nonsignatory defendant. In situations in which a plaintiff would be entitled to attorneys fees should the plaintiff prevail, and the plaintiff sues a nonsignatory defendant on a contract as if he or she were a party to the contract, the nonsignatory defendant is allowed to seek its' fees. Plaintiffs argue that if they had been successful against Defendant Roche, they would not have been entitled to a contractual award of attorneys' fees and thus Roche may not recover attorneys' fees under the Agreement.

■ Roche argues that the language of the Release Agreement clearly shows that the parties *intended* he be covered. The language in Paragraph 15 specifically releases not just CBS, but its' "employees." Roche further argues that if there is a sufficient *"nexus"* between the parties, a party such as Roche is entitled to "stand in the shoes" of CBS and be entitled to the same coverage.

Plaintiffs' citation to Section 1717 and the argument that it is necessary that recovery of fees be "reciprocal" misses the issue. First, the Special Master questions whether Plaintiffs are correct in their assertion that they would not be entitled to fees pursuant to Section 1717. Second, Roche is entitled to fees under the wording of the Agreement. The Special Master agrees that applying ordinary rules of contractual intention the wording of the Release Agreement establishes that the parties intended that employees such as Roche could not be sued, even if not expressly named. The Release applies to all employees of CBS, and Plaintiffs cite no authority requiring each of the employees is required to sign in order to be covered under the Agreement's terms.

Furthermore, the cases cited by Plaintiffs are distinguishable on their facts. In *Topanga* the defendant was not allowed to recover fees pursuant to the contract because he had been voluntarily dismissed from the contract cause of action. *Super 7 Motel Associates* involved a sale of real property in which the broker attempted to invoke the attorneys' fees provision in the contract between the buyer and seller. However, the broker was not a party to the contract in the sense that Roche is a party to the Release. Here "employees" of CBS were clearly included and specifically named. Furthermore, the cases cited by Defendants did provide for recovery of fees in situations in which the contract at issue reflected the intent that a party be covered and a sufficient nexus existed between the parties (*Loduca v. Polyzos* (2007) 153 Cal.App.4th 334, 343, 62 Cal. Rptr.3d 780, and *Real Property Services Corp. v. City of Pasadena* (1994) 25 Cal. App.4th 375, 30 Cal.Rptr.2d 536.)

The Special Master concludes that as indicated in the cases cited by Defendants there is a sufficient "nexus" between the parties which entitles Roche to essentially stand in the shoes of CBS and be entitled to the same coverage, and therefore this argument is not a valid basis for defeating Defendants' claims for Attorneys' fees.

**8.** Roche's attorneys' fees and costs were ultimately paid by CBS (*see* Declaration of Roche, para. 8.)

## III

### *Recovery of Attorneys' Fees in Certain Statutory Actions*

Plaintiffs argue that certain statutes (e.g. the Cartwright Act) allow an attorneys' fees award only to a specified party, such as a prevailing plaintiff, and when a defendant prevails in an action containing causes of action for both breach of contract and violation of such a statute, the parties' contractual attorneys' fee clause and Civil Code section 1717 cannot be used to award the defendant its' attorneys' fees attributable to the statutory action, because doing so effectively allows the parties' private contract to override the statute. Plaintiffs cite Code of Civil Procedure section 1021, which provides that compensation of attorneys is left to the agreement of the parties except as specifically provided by statute. Plaintiffs therefore conclude that any fees attributable to the statutory action cannot be included in the fees awarded to a prevailing defendant. In support Plaintiffs cite *Carver v. Chevron U.S.A.* (2002) 97 Cal.App.4th 132, 118 Cal.Rptr.2d 569, *Carver v. Chevron U.S.A.* (2004) 119 Cal. App.4th 498, 14 Cal.Rptr.3d 467 and *Wood v. Santa Monica Escrow Co.* (2007) 151 Cal.App.4th 1186, 60 Cal.Rptr.3d 597.

Here Plaintiffs sued Defendants for public nuisance and violations of the Sherman Act. Plaintiffs argue that plaintiffs who are successful on these types of claims are entitled to attorney fees, but that defendants that prevail in such actions are not so entitled because the statutes providing fees for these types of actions are not reciprocal.

Specifically, regarding the public nuisance claim, Plaintiffs argue fees are allowed a prevailing plaintiff pursuant to Code of Civil Procedure section 1021.5 (assuming certain other criteria are met). Plaintiffs further argue that because recovery of attorneys' fees is not reciprocal under section 1021.5, Defendants cannot use the contractual fees clause from the Agreement to recover fees attributable to the public nuisance cause of action because doing so would effectively allow the Agreement to override section 1021.5. Similarly, Plaintiffs argue the Sherman Act authorizes recovery of attorneys' fees only for successful plaintiffs, citing 15 USCS section 15.

The Special Master acknowledges that certain statutes, such as the Cartwright Act cited by Plaintiffs, places limits on a prevailing defendant's ability to recover attorneys' fees, even if there is a fee provision in the parties' contract. In other words, if you sue under circumstances in which there is a statute that provides for fees only to a prevailing plaintiff, and the defendant prevails, even if you have a contract with the other party which also provides for fees, the statute "trumps" the contract and the defendant is not entitled to attorneys' fees.

However, while this rule is true of certain statutes, it is not true under these facts and the statutes at issue. First, regarding Plaintiffs' public nuisance argument, it is not true, as Plaintiffs argue, that all such cases are necessarily fee-shifting plaintiffs-only prevailing types of case. As Defendants argued at the hearing, Defendants rely on section 1021.5 (private attorney general doctrine) for their argument. For a plaintiff to recover fees for a public nuisance cause of action the plaintiff must establish the action confers some sort of "public benefit." As was explained in *Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629, 71 Cal.Rptr.2d 632, cited by Defendants, the purpose of section 1021.5 is to encourage private litigants to bring suits that would otherwise not be brought and which confer a public benefit. The Court explained fees are not awarded in circumstances in which a plaintiff brings suit for his or her own

pecuniary interests (*id.* at p. 635, 71 Cal. Rptr.2d 632.) However here the Special Master, the District Court, and the 9th Circuit Court of Appeal all determined there was absolutely *no public benefit* aspect to Plaintiffs' public nuisance cause of action. Thus this would not be the type of case in which only a prevailing plaintiff would be entitled to fees.

As for Plaintiffs' antitrust cause of action, Plaintiffs failed to cite any case, either in their briefing or at the hearing, in support of their argument that the Sherman Act trumps a private contract when it comes to a fee award. The only cases cited pertained to actions pursuant to the Cartwright Act. Therefore, the Special Master concludes that there is no basis on which to require allocation of fees for the statutory causes of action.

### Award of Attorney's Fees

Having determined that Plaintiffs' objections to an award of attorney's fees to Defendants as prevailing parties are invalid, the Master now turns to the issue of the appropriate amount, *i.e.*, are the fees being requested both reasonable and necessary.

### Legal Standard

As set forth in Ninth Circuit case law, in determining reasonable attorney's fees the district court should first calculate a lodestar (the number of hours reasonably expended in the litigation multiplied by a reasonable hourly rate) adjusted by the "*Kerr* factors"; *McGrath v. Co. of Nevada*, 67 F.3d 248, 252 (9th Cir.1995):

> "In determining a reasonable attorney's fee, the district court's first step is to calculate a 'lodestar' by multiplying the number of hours it finds the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). The district court should exclude hours that were not " 'reasonably

expended.' " *Id.* at 434, 103 S.Ct. at 1939 (quoting S. Rep. No. 94–1011, pg. 6 (1976) U.S.Code Cong. & Admin.News 1976 at pp. 5908, 5913). In determining what constitutes a reasonable fee, the district court should take into account the factors set forth in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69–70 (9th Cir.1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976, that it finds to be relevant). *D'Emanuele v. Montgomery Ward & Co.*, 904 F.2d 1379, 1383, 1386 (9th Cir.1990).

> FN4. In *Kerr*, we held the following factors are appropriate for consideration in determining a reasonable attorney's fee award:
>
> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.
>
> 526 F.2d at 70.

The second step in the fee calculation is to assess whether the presumptively reasonable lodestar figure should be adjusted on the basis of Kerr factors not already subsumed in the initial calculation. *Id.* at 1383. The application of this step is not at issue here.

Although § 1988(b) endows the district court with discretion to determine what constitutes a reasonable attorney's fee, the Supreme Court has directed

that 'it remains important ... for the district court to provide a concise but clear explanation of its reasons for the fee award.' *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941. If the district court fails to provide a clear indication of how it exercised its discretion, we will remand the fee award for the court to provide an explanation. *D'Emanuele*, 904 F.2d at 1385.

In *Cabrales v. Co. of Los Angeles*, 864 F.2d 1454, 1464 (9th Cir.1988), the Ninth Circuit also noted:

" 'The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.' *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939. This 'presumptively reasonable fee,' known as the lodestar figure, may then in 'rare' and 'exceptional' cases be 'adjusted' on the basis of 'other considerations.' *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564–65, 106 S.Ct. 3088, 3098–99, 92 L.Ed.2d 439 (1986) (quoting in part *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). In *Hensley*, the Supreme Court noted that, while these 'other considerations' included factors previously used in assessing the overall reasonableness of fees, *see Johnson v. Georgia Highway Express, Inc.* 488 F.2d 714, 717–19 (5th Cir.1974); *accord Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir.1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976), many of these same factors are now 'subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate,' 461

U.S. at 434 n. 9, 103 S.Ct. at 1940 n. 9. It is now clear that among these factors that 'cannot serve as independent bases for adjusting fee awards are: (1) the novelty and complexity of the issues, (2) the special skill and experience of counsel, (3) the quality of representation, and (4) the results obtained.' *Jordan*, 815 F.2d at 1262 n. 6 (citing *Blum*, 465 U.S. at 898–900, 104 S.Ct. at 1548–1549). Presumably each of these factors are [sic] taken into account in either the reasonable hours component or the reasonable rate component of the lodestar calculation."

Also, *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69–70 (9th Cir.1976); [9] and *PLCM Group v. Drexler, et al.*, 22 Cal.4th 1084, 1096, 95 Cal.Rptr.2d 198, 997 P.2d 511 (2000), wherein the California Supreme Court summarizes the factors at the trial it is to consider as the amount involved, the difficulty and nature of the litigation, the skill required and employed, and success or failure of the result.

As stated, CBS seeks to recover the attorney's fees it paid to its counsel, namely, Davis, Wright & Tremaine ("DWT"), and for the two law firms Roche retained, Miller, Stan & Regalia ("MSR") and Powell, Goldstein ("PG"). The Master will analyze the claims of CBS and Roche separately.

### CBS Attorney's Fees

CBS claimed attorney's fees are $331,757.00, plus $8,259.00 in costs. As CBS notes, the litigation went on for some three years. Plaintiffs' suit was filed in August 2006, the District Court entered judgment in favor of CBS and Roche in December 2007, and thereafter, Plaintiffs

---

9. Plaintiff devoted virtually all of his arguments to the contention that attorney's fees could not be awarded to Defendants under the contractual clause in question. *Other than to contend that the attorney's fees demanded were unreasonable on their face, there was no detailed analysis of the fees requested by Defendants, and no specific contentions any particular fees were not reasonably incurred.*

appealed to the Ninth Circuit, which affirmed the District Court's judgment on July 8, 2009, and transferred the matter back to the District Court to address the claim by Defendants for their attorney's fees. The District Court then assigned the matter to the Special Master for his opinion and recommendation.

### The Lodestar

■ The total amount of hours spent by CBS's attorneys "DWT" was 813.7. Although a total of nine attorneys were involved, the great majority of the work was done by partners Allison Davis and Duffy Carolen, *i.e.*, 712 hours. The hourly rate charged over the three-year period ranged from a low of $213 per hour in 2006 to a high of $480.25 per hour in 2008/2009. The average hourly rate was $408. In the Master's opinion, the hourly rates of the attorneys involved was extremely reasonable.

### Analysis of "Kerr Factors"

In the Master's opinion, the important "*Kerr* factors" involved in both CBS's and Roche's claims for attorneys' fees, in addition to the time required, are (2) the novelty and difficulty of the questions involved, (3) the legal skill required to perform the legal services in a proper manner, (8) the amount involved and the results obtained, (9) the experience, reputation and ability of the attorneys, and (12) awards in similar cases.

A brief analysis of the aforestated factors indicates that the legal questions presented were not particularly novel, although there were a substantial number of legal authorities to review and analyze in light of Plaintiffs' challenge to the release language of the contract as void and unenforceable under. California Civil Code § 1688. Also, counsel had to generally familiarize themselves with the other litigation by Plaintiffs against Defendant Clear Channel.

The skill required of an attorney handling this matter called for someone who had substantial experience (probably at least 10 years) with civil litigation in the federal courts. Here all the lead attorneys involved possessed that experience.

The amount involved could have been substantial (and thus increasing the risk) because Plaintiffs' claim alleged both an antitrust injury, as well as a public nuisance, unjust enrichment, and intentional interference with prospective economic advantage. The claims also covered a wide area of the law, thus adding to the complexity of defense counsel dealing with the pleadings and legal arguments.

The result obtained was excellent. The Special Master recommended the matter be dismissed without leave to amend and the District Court agreed, as did the Ninth Circuit.

As to attorney's fees awards in similar cases, the Master has some 50+ years experience in civil litigation and finds the gross amount of fees claimed by CBS (as distinguished from Roche's claim which will be analyzed separately) to be in the reasonable range of what it takes to defend cases of this type in the modern era. A breakdown of when certain fees were incurred supports the Master's opinion. Approximately $177,000 of the fees was expended from the time the claim was filed through motions and hearings before both the Special Master and the District Court Judge. This, of course, involved necessary research and consultation, as well as drafting the motions, and the hours expended appear to be within the range of cases of similar complexity.

Plaintiffs appealed to the Ninth Circuit and the fees on appeal were $95,500, which, of course, included filing briefs, arguments, consultations, review of case law, etc.; by any standard, a reasonable amount. The remaining fees of approxi-

mately $67,500 were post-appeal which related primarily to the issue of attorney's fees and included briefs and argument before the Special Master.

Overall, it is the opinion of the Special Master that the attorney's fees paid by CBS to its counsel are in the reasonable area and should be approved for the reasons set out in some detail heretofore.

Accordingly, the Master finds the appropriate lodestar to be: 813.7 hours at an average rate of $407.71 per hour, which, as pointed out in *Cabrales, supra,* should only be adjusted in "rare and exceptional cases."

### Roche Attorney's Fees

Roche was an employee of CBS and was sued personally. In addition, he contended there were a number of personal threats made to him regarding the litigation by the Plaintiffs, and he looked at the allegations in the Plaintiffs' complaint as personally jeopardizing his entire career. Therefore, he decided it was necessary for him to hire his own personal counsel.

First of all, Plaintiffs decided not just to sue CBS in this litigation but also its employee Roche. Therefore it seems clear Roche had the right to hire his own counsel, to which CBS apparently acquiesced as it paid the fees and costs. There has been no argument made that Roche didn't have the right to his own counsel.

However, Roche hired not just one attorney but two; he hired "MSR" for their expertise in real property matters, and he hired PG for their expertise in antitrust matters as Plaintiffs' complaint contained a cause of action for antitrust violations. It should be pointed out that CBS, faced with the same claims, hired one full service law firm which had expertise in all of the claims, which frankly seems the more reasonable thing to do.

In the Master's opinion, there are two issues regarding Roche's claim for attorney fees:

1) Is there a duplication of efforts between MSR and DWT?

2) Was it reasonably necessary for PG, retained solely for the antitrust issue, to incur 263.2 hours in this matter in light of the fact that the matter was decided by a motion to dismiss based primarily on the release and covenant not to sue in the contract?

The Master will address the Defendant's (Roche) fee request for both firms separately.

### Defendant's Claim for Reimbursement of MSR Attorney's Fees and Costs

Although MSR's total attorney's fees bill is less than DWT's, MSR actually spent more hours on the case, 1,001.3 versus DWT's 813.7. The Master has thoroughly reviewed all of the invoices of both firms and finds that in general they were working on the exact same issues for their respective clients. This is not surprising since the obvious first legal stratagem for both CBS and Roche was the filing of a motion to dismiss based on the release and covenant not to sue provision of the agreement between Plaintiffs and Defendants. In going through the time sheets of both firms, one sees the same types of notations: "researching and evaluating case law to support motion to dismiss" (re application of release and covenant); "preparing and drafting and redrafting motion to dismiss," "review of case authority," "review and revise motion to dismiss," "review of Plaintiffs' response and preparing reply brief," "analysis of tentative ruling," and thereafter working on the appeal. In both the motion to dismiss and the appeal, the same issues are applicable to both Roche and CBS.

There appears to be evidence of cooperation and discussion between the two firms, but there is no real evidence presented of certain tasks being assigned or handled by only one firm. In short, while recognizing that issues have to be crafted toward the individual client, there still appears to be a goodly amount of duplication of work.

Accordingly, based on the evidence presented, the Special Master recommends that in determining the hour portion of the lodestar that between 33.33 percent and 40 percent (or using an average figure of 36.5 percent) be reduced from the hours claimed, because of duplication of effort resulting in a reasonable hour figure of 635.63. The hourly rate charged by MSR, which is an average rate of $263.63, is by any standard extremely reasonable. Therefore, the proper lodestar is determined by multiplying 635.63 hours by $263.63, resulting in an award to Roche regarding MSR's attorney's fees of $167,571.14 plus costs of 1,412.68.[10]

*Defendants' Claim for Reimbursement of PG's Attorney's Fees and Costs*

██ PG's claim for attorney's fees is $125,361.74, plus costs of $19,863.25. PG's total attorney hours spent come to 263.2, with an overage effective rate of $476.30 per hour. In reviewing their bills, the Master notes that the hourly fees of the attorneys working on the case range from $275–$575 per hour in 2006, with the high range increasing to $650 per hour in 2007. In the Master's opinion, these are reasonable hourly rates for the experienced lead attorneys of PG practicing in the metropolitan San Francisco, California, area.

The problem is that if Roche is going to take the somewhat unusual step of hiring a second law firm to represent him on the basis he needs a firm with antitrust expertise, then he should only be able to ask Plaintiffs to reimburse him (or rather CBS) for those charges that were incurred for necessary antitrust work.

The invoices of all three firms indicate they clearly recognized that the first obvious legal move was to file a motion to dismiss on the basis that Plaintiffs had contractually agreed not to sue the Defendants. The only need for antitrust work at this time was to include in the motion to dismiss a section moving to dismiss this claim on the bases that Plaintiffs had failed to plead an antitrust injury, as well as other deficiencies in their antitrust pleading. How many attorney hours should be reasonably spent on this task? An answer comes from CBS, which had to answer the same allegations, and it spent $18,542 in attorney's fees for antitrust matters, which at DWT's average rate of $408 per hour equals 45 hours. Frankly, the Master sees no reason why more hours needed to be put in on the antitrust issue at that time.[11] If the release argument on the motion to dismiss fails, then one can gear up the antitrust work at that time. That is exactly how CBS's counsel handled it.[12]

Recognizing that there is time needed for a firm to familiarize itself with a client's case, nonetheless, the aforesaid fig-

---

**10.** The Special Master recognizes that this is an approximation of the probable amount of duplication of hours, but it is based on the invoices and time sheets, as well as his own extensive experience. Also, he recognizes that the duplication of hours could have been deducted from either DWT's fees or MSR's fees.

**11.** The Special Master, in working on the motion to dismiss, had to deal with the antitrust issues and found them for the purpose of the motion to be relatively simplistic-a further reason as to why only a minimal amount of hours should have been spent on antitrust issues.

**12.** It was agreed that PG did no work on the appeal issue.

ure of 46 hours seems a reasonable time period for Roche's second firm to spend on the case, particularly in light of the fact that MSR was Roche's main firm. Therefore, the Master finds the appropriate lodestar for PG would be 45 hours times its average rate of $476.30 per hour, equaling $21,433.50, plus its claim for costs.

*Summary of Attorney's Fee Award*

The Special Master recommends the following attorney's fees award to be recovered from Plaintiffs:

To CBS: Attorney's fees of $331,757.00; costs of $8,324.00. To Roche:

Attorney's fees of the firm MSR $167,571.14; costs of $1,412.68.

Attorney's fee of the firm PG $21,433.50; costs of $19,863.25.

## REPORT AND RECOMMENDATION BY SPECIAL MASTER

### INTRODUCTION

The parties requested that the Special Master prepare a "Tentative Ruling" on their submitted motions prior to both the oral argument on these motions on March 2, 2007, and the Special Master's issuing of a final "Report and Recommendation by Special Master" to the Federal District Court. A Tentative Ruling was issued on February 26, 2007, and a hearing was subsequently held at the JAMS offices in San Francisco, California on March 2, 2007. Having considered the arguments made at the hearing and the parties' subsequent letter briefing the Special Master is now prepared to issue a final Report and Recommendation.

Two sets of motions were referred to the Special Master, the Honorable Eugene F. Lynch (Ret.): [1]

The *first* set concerns Plaintiffs Raymond Reudy's and Kevin Hicks' ("Plaintiffs") initial lawsuit, filed in June 2002, against Defendant Clear Channel Outdoor, Inc. ("Clear Channel"), alleging violations of Business and Professions section 17200.[2] Based on recent changes to the San Francisco Planning Code, Clear Channel has filed a Motion for Summary Judgment, arguing that these recent legislative developments require that the Court *abstain* from entertaining any equitable remedy sought by Plaintiffs, and further requires that the case be *dismissed* to allow the City to adjudicate any issues related to Clear Channel's signs.[3]

The *second* set of motions addresses Plaintiffs' recent lawsuit, filed in August 2006, against Defendants Clear Channel, William Hooper ("Hooper"), CBS Corporation ("CBS") and Patrick Roche ("Roche") (collectively "Defendants.")[4] Plaintiffs' complaint alleges intentional interference with prospective economic advantage, public and private nuisance, Sherman Act violations and unjust enrichment. All Defendants have filed 12(b)(6)

---

1. Both sets were referred by the Honorable Judge Samuel Conti, of the United States District Court for the Northern District of California.

2. *Raymond Reudy and Kevin Hicks individually and doing business as Advertising Display Systems (Plaintiffs) v. Clear Channel Outdoor, Inc., a Delaware corporation (Defendants)* [Case No. C–02–5438–SC]

3. As stated above, Clear Channel has also filed an Amended Motion for Dismissal, Judgment on the Pleadings and Summary Judg-

ment, and a Second Amended Motion for Dismissal, Judgment on the Pleadings and Summary Judgment. All rely on the same argument as the Motion for Summary Judgment, *i.e.,* the abstention doctrine.

4. *Raymond Reudy and Kevin Hicks dba Advertising Display Systems and ADS–1, a California limited liability company (Plaintiffs) v. Clear Channel Outdoor, Inc., a Delaware corporation, William Hooper, an individual, CBS Corporation, a Delaware corporation, Patrick Roche, an individual, and Does 1–50 (Defendants)* [Case No. C–06–5409–SC.]

motions to dismiss, arguing Plaintiffs have failed to state claims upon which relief may be granted. In addition, CBS and Roche argue the entire action against them is barred by a Release and Covenant not to sue they entered into with Plaintiffs in December 2003. Plaintiffs have filed Oppositions to all the motions.

### FACTS

*Brief Overview of the Relevant Regulations regarding Advertising Signs in the City & County of San Francisco*

Outdoor advertising companies, such as Plaintiffs' and Defendants', lease their sign locations from real property owners and rent their sign space to advertisers.[5] These outdoor advertising signs are regulated under the City Planning and Building Codes. Pursuant to these regulations, a permit is required in order for an outdoor advertising company to legally maintain and operate a general advertising sign anywhere in the City, and the installed sign must conform to the permit issued for that sign at that location.

In 1965 the San Francisco Sign Ordinance, the City's most sweeping sign regulation overhaul to date, was adopted. It defined business signs and general adver-

tising signs, and set forth specific permit requirements for the erection, placement, replacement, reconstruction, relocation or expansion of any sign.

San Francisco Planning Code section 604.1 was enacted on May 18, 2001, and gave outdoor advertising sign companies and property owners one year from the effective date of the legislation to find and post on each sign in operation its' permit number and permitted dimensions. If no permit could be located, then the owner of the sign was allowed to apply for and obtain an "in-lieu identifying number," to be posted in lieu of posting a permit number, provided that it was established that a permit had been lawfully issued in the first instance.[6]

Proposition G, passed in March 2002, added Planning Code section 611, which prohibited the issuance of permits for any *new* general advertising signs in the City, and amended section 602.7 to redefine a general advertising sign to mean a sign "legally erected prior to the effective date of section 611."

Most recently, Section 604(h) of the San Francisco Planning Code was amended, effective July 22, 2006, to specify examples of permissible maintenance and repairs.[7]

---

**5.** In their 2006 complaint Plaintiffs allege Clear Channel and CBS each possess approximately 47.5% of the outdoor advertising sign market.

**6.** Defendant Clear Channel has filed 220 in lieu permit applications with the City Planning Department and Defendant CBS has filed 94.

**7.** This provision provides: "(h) Unless otherwise provided in this Code or in other Codes or regulations, a lawfully existing sign which fails to conform to the provisions of this Article 6 may remain until the end of its normal life. Such sign may not, however, be replaced, altered, reconstructed, relocated, intensified or expanded in area or in any dimension except in conformity with the provisions of this Code, including Subsection (i)

below. Ordinary maintenance and minor repairs shall be permitted, but such maintenance and repairs shall not include replacement, alteration, reconstruction, relocation, intensification or expansion of the sign; provided, however, that alterations of a structural nature required to reinforce a part or parts of a lawfully existing sign to meet the standards of seismic loads and forces of the Building Code, to replace a damaged or weathered signboard, to ensure safe use and maintenance of that sign, to remediate hazardous materials, or any combination of the above alterations shall be considered ordinary maintenance and shall be allowed. A sign which is damaged or destroyed by fire or other calamity shall be governed by the provisions of Sections 181(d) and 188(b) of this Code."

Similarly San Francisco Planning Commission Resolution No. 17258, adopted on June 8, 2006, adopted criteria for the legalization of existing general advertising signs.

In addition, the City enacted Planning Code section 604.2, titled "General Advertising Sign Inventories." It requires any entity that owns a general advertising sign in the City to submit and maintain complete inventories of its signs for the purpose of allowing the City to review the compliance of each sign with the City's regulatory scheme. Under this new law every general advertising company must submit an inventory of its signs, along with an inventory processing fee.[8]

*Procedural History of the Litigation*

In January 2002, Plaintiffs commenced their initial action against Clear Channel in San Francisco Superior Court. Plaintiffs' original complaint alleged two causes of action against Clear Channel, the first for unfair competition, and the second for unfair business practices, both pursuant to Business and Professions Code section 17200, *et seq.*

Plaintiffs' case was based on allegations that Clear Channel's operation, maintenance and use of approximately 385 billboards, rooftop and wall signs (general advertising signs) were in violation of various provisions of the San Francisco Planning and Building Codes, and that Clear Channel's activity deprived Plaintiffs of the opportunity and right to fairly compete. Based on their interpretation of the local ordinances and Proposition G, Plaintiffs argued that Clear Channel was required to remove the signs in lieu of bringing them into compliance with the Codes.

Clear Channel removed the action to the Federal District Court in November 2002,[9] and the parties stipulated to Plaintiffs filing an amended complaint, which included claims for both unfair competition and nuisance. In December 2002, Clear Channel moved to dismiss, and the court issued an order dismissing Plaintiffs' nuisance claim.

Clear Channel thereafter sought a stay of the action, based on the doctrine of primary jurisdiction, to allow the City time to implement enforcement of its own sign ordinances pursuant to the "In Lieu Permit Number" process created under Section 604.1 of the Code. A stay order was issued in April 2003, and continued until June 2004, when it was partially lifted in order that discovery could commence as to the first phase of 25 signs.

In December 2003, while the Clear Channel action was pending, Plaintiffs and CBS entered into an Agreement whereby CBS purchased seven billboards from Plaintiffs for $2 million dollars. As part of the Agreement, the parties entered into a "Release" which provided that Plaintiffs released CBS "from any and all causes of action," and furthermore specifically provided that Plaintiffs would not "commence any litigation, arbitration or other proceeding" against CBS "that is similar in any way to the action . . . against Clear Channel."

In November 2004, the Clear Channel case was ordered to the Special Master. Plaintiffs thereafter again sought leave to amend the complaint to add additional claims under the Racketeer Influenced Corrupt Organizations Act ("RICO") and the Sherman Act. However, Plaintiffs' pro-

---

**8.** This fee was established by recently enacted Planning Code Section 358 and sets the fee at $560 per sign.

**9.** In November 2002, Plaintiffs commenced a second action against Defendant Clear Chan-

nel in Alameda Superior Court, alleging similar facts, and it too was removed to federal court and consolidated with the present action.

posed Second Amended Complaint, and the proposed RICO and antitrust causes of action therein, were later withdrawn.

Plaintiffs next filed a Motion for Leave to File a Third Amended Complaint to add new causes of action for interference with contract and prospective economic advantage, public and private nuisance, and unjust enrichment.[10]

After reviewing the motion, the Special Master recommended: (1) that leave to amend to add a cause of action for nuisance should *not* be granted because Plaintiffs had failed to allege some "special injury" arising out of the alleged nuisance, as was originally found by Judge Conti; (2) that the amendment to allege the cause of action for interference with contract and prospective economic advantage be allowed; and (3) that amendment to add a cause of action for unjust enrichment be denied because unjust enrichment is not a separate cause of action, but is tied to other causes of action.

In November 2005, the Special Master heard three days of testimony and took evidence on the factual foundational issues related to each of the 25 signs for which the stay had been lifted. On May 8, 2006, the Special Master issued findings of fact on the factual history of each of these 25 signs.

In late May and early June, the Special Master took evidence on the legal issues concerning Plaintiffs' standing to bring their Section 17200 claim, and whether Plaintiffs were entitled to a mandatory injunction. However, after Clear Channel began presentation of its evidence, the parties agreed to halt the hearing in order to attempt to mediate the dispute. After two days of mediation the parties were unable to resolve the case.

In August 2006, Plaintiffs filed a new complaint against Clear Channel, as well as Hooper, CBS, and Roche. This complaint alleges causes of action for nuisance, unjust enrichment, monopolization and intentional interference with an economic relationship. The above described set of motions was thereafter filed.

## DISCUSSION

### I. *Applicable Standards for Summary Judgment, Judgment on the Pleadings and Dismissal*

Federal Rule of Civil Procedure 56, subsection (c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (*Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202.)

"Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." (*Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.* (9th Cir.1989) 896 F.2d 1542, 1550; Rule 12(c).)

Rule 12(b)(6) provides for dismissal if the complaint fails to state a claim upon which relief may be granted. "A complaint should not be dismissed under Rule 12(b)(6) 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' [Citation.] Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."

---

**10.** This motion for leave to file a third amended complaint was referred to the Special Master for a "Report & Recommendation" by order dated October 28, 2005.

(*Balistreri v. Pacifica Police Dept.* (9th Cir.1988) 901 F.2d 696, 699.)

II. *Clear Channel's Motion for Summary Judgment, Judgment on the Pleadings, or Dismissal*

Clear Channel argues that the Court should *abstain* from entertaining any equitable remedy sought by Plaintiffs, and dismiss the action in order to allow the City to adjudicate any issues related to Clear Channel's signs. The Special Master initially finds that although Clear Channel moves for summary judgment, judgment on the pleadings or dismissal, it appears from Clear Channel's argument and reliance on the abstention doctrine that the underlying basis of the motion is actually one for *dismissal.*

The doctrine of abstention is summarized as follows: "Where [an unfair competition law] action would drag a court of equity into an area of complex economic [or similar] policy, equitable abstention is appropriate." In such cases, it is primarily a legislative and not a judicial function to determine the best economic policy. (*Shamsian v. Dept. of Conservation* (2006) 136 Cal.App.4th 621, 641–642, 39 Cal. Rptr.3d 62; *see also Desert Healthcare District v. PacifiCare, FHP, Inc.* (2001) 94 Cal.App.4th 781, 114 Cal.Rptr.2d 623; *CA Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205, 27 Cal.Rptr.2d 396; and *C. Sterling Wolfe v. State Farm Fire & Casualty Insurance* (1996) 46 Cal. App.4th 554, 53 Cal.Rptr.2d 878.)

Clear Channel points to the recently enacted legislation which it argues supports their abstention argument because it indicates an intent by the City to enforce its' sign regulations (*i.e.,* amended Planning Code section 604(h), Planning Commission Resolution No. 17258 and recently enacted Sections 358 [inventory processing fee] & 604.2 [advertising sign inventories.]) Clear Channel also argues that there is a risk of duplication of effort and a potential for inconsistent results if the abstention doctrine is not applied.

Plaintiffs argue [11] that the abstention doctrine should not apply given the City's limited personnel and funding for enforcement of its advertising sign regulations.[12] Plaintiffs assert that the City has been "dragging its feet" on enforcement, *i.e.,* Plaintiffs call Clear Channel's view of future sign code enforcement "Pollyannic" because Plaintiffs claim the City has failed to enforce existing violations for years and are still years away from future enforcement. Relying on a Letter by the San Francisco Zoning Administrator Lawrence B. Badiner, Plaintiffs claim that the City actually supports private party lawsuits such as theirs to assist with the enforcement of its Codes.

Plaintiffs also argue that the new inventory provision is not "enforcement" and has only generated a one-time fee of approximately $465,000. Citing to a Declaration by Robert Passmore, a former employee with the City as a Planning and Zoning Administrator, they argue that the

---

**11.** Initially, Plaintiffs argue Judge Conti has already considered and ruled on this issue, rejecting Clear Channel's arguments. The Special Master has reviewed the relevant portion of the transcript hearing and finds this is not an accurate statement of the Court's holding (RT 8/04/06.)

**12.** Plaintiffs' Opposition contains supporting Declarations regarding conversations with several employees in the City Planning De-

partment, *i.e.,* Passmore, and Hicks. Clear Channel has objected to some of the information contained in the Hicks and Passmore declarations as inadmissible hearsay. The Special Master has reviewed the Declarations, and although their consideration is not necessary in making a Recommendation, it does appear the declarations contain hearsay evidence, *i.e.,* Hicks and Passmore are summarizing statements made by others in the Department.

best current estimate from the City Planning staff is that enforcement on these inventoried signs will not begin for at least three years.

Finally, Plaintiffs argue that Clear Channel misreads the current Code which Plaintiffs argue (as they have before) requires any sign re-built or re constructed at the same location to constitute a *new* sign prohibited under Planning Code Section 611(a), and thus Resolution 17258 (permitting legalization) is in *conflict* with the existing City Code.[13] In their Response Plaintiffs thus request a *prohibitory* injunction requiring Clear Channel to stop using its signs.[14]

In his Tentative ruling the Special Master, having reviewed the abstention cases cited by Clear Channel, acknowledged that Clear Channel had made a plausible argument regarding abstention. However, the Special Master also noted that in the cases cited by Clear Channel, it was arguable that broader and more complex matters of economic and/or social policy were implicated. (*Shamsian v. Dept. of Conservation* (2006) 136 Cal.App.4th 621, 39 Cal. Rptr.3d 62 [beverage recycling laws]; *Desert Healthcare District v. PacifiCare, FHP, Inc.* (2001) 94 Cal.App.4th 781, 114 Cal.Rptr.2d 623 [healthcare services contracts]; *California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205, 27 Cal.Rptr.2d 396 [bank service fees]; *C. Sterling Wolfe v. State Farm Fire & Casualty Insurance* (1996) 46 Cal.App.4th 554, 53 Cal.Rptr.2d 878 [earthquake insurance].) Furthermore, application of the

abstention doctrine would result in a *dismissal* of Plaintiffs' claims. Thus the Special Master at that time concluded that application of the abstention doctrine appeared premature. Having considered the parties arguments at the March 22nd hearing, the Special Master still finds abstention and dismissal to be inappropriate at this time.

Therefore, the Special Master recommends that the Court, as in its original Order of April 11, 2003, continue to stay the action pursuant to *the doctrine of primary jurisdiction.* As Judge Conti explained in his April 11, 2003 Order, primary jurisdiction applies when enforcement of a claim which is originally cognizable in the courts requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body. Under these circumstances the judicial process is *suspended* pending referral of such issues to the administrative body for its views. (*See Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 390, 6 Cal.Rptr.2d 487, 826 P.2d 730.)

"[T]he primary jurisdiction doctrine advances two related policies: it enhances court decision making and efficiency by allowing courts to take advantage of administrative expertise, and it helps assure uniform application of regulatory laws. No rigid formula exists for applying the primary jurisdiction doctrine. Instead, resolution generally hinges on a court's

---

**13.** The Special Master notes that any issue concerning a potential conflict between the City's newly enacted general advertising sign laws and the City's Planning Department procedures is not properly before the court at this time, and if to be legally tested, should be the subject of a separate lawsuit.

**14.** However, throughout the history of this case Plaintiffs have sought a *mandatory* in-

junction requiring Clear Channel to take down the general advertising signs Plaintiffs allege are illegal. The Special Master does not find that the type of relief sought is material to application of the primary jurisdiction doctrine, and furthermore Plaintiffs have not attempted to establish the prerequisites for such extraordinary relief.

determination of the extent to which the policies noted above are implicated in a given case." (*Farmers Ins. Exchange v. Superior Court, supra,* 2 Cal.4th at pp. 391–392, 6 Cal.Rptr.2d 487, 826 P.2d 730.)

Given the recent legislation and funding that was passed to address billboard compliance, this principle appears to be even *more* applicable now than at the time of Judge Conti's original order. As set forth in the Planning Commission Executive Summary under "benefit of Legislation," the purpose of the newly enacted section 604.2 is to provide a cohesive mechanism and funding for undertaking a comprehensive review of all general advertising signs located with the City to assure Code compliance, timely process code violations, and pursue the removal of nonconforming signs.

The Special Master acknowledges that Plaintiffs may believe the City's enforcement procedures are unsatisfactory, but that is insufficient to prevent a Court from deferring to the City's expertise. Plaintiffs fail to cite to any authority under either the abstention or primary jurisdiction doctrines that support denying a stay simply because the City is allegedly ineffectively enforcing its sign ordinance[15]. Furthermore, even assuming Plaintiffs could establish a Section 17200 case, the City, with its expertise in these specialized land use issues, is better suited to more effectively and quickly address whether a sign is illegal under the applicable ordinances, and should be given the opportunity to do so. (*CA Grocers Assn. v. Bank of America, supra,* 22 Cal.App.4th at p. 218–219, 27 Cal.Rptr.2d 396.) The newly enacted inventory processing fee will assist in this endeavor and provide the necessary

resources to the City to enforce code compliance.

Thus the Special Master finds that given the required sign inventories and additional funding, along with the amendments outlining the types of corrective actions permissible, the City has indicated its intent to address sign compliance issues, is in the best position to do so, and therefore should be given the opportunity.[16] However, the Special Master also believes that abstention and dismissal is not warranted under these facts, and therefore a stay be issued pursuant to the doctrine of primary jurisdiction.

In the Special Master's Tentative Ruling it was recommended that the stay apply also to the 25 signs for which Judge Conti lifted his earlier stay. The Special Master also noted that he was aware of the interests of Plaintiffs and their concern that the City promptly enforces its sign regulations. Thus the Special Master recommended in the Tentative Ruling that Plaintiffs should be afforded an opportunity to periodically check in with the Court or the Special Master to determine if progress is in fact being made toward enforcement of the sign regulations, and suggested a hearing be held every six to eight months either before the Court or Special Master in order to review the City's progress on enforcement.

Pursuant to the arguments of the parties at the March 2nd hearing the Special Master still recommends, that a stay be enforced which would include the 25 signs for which the original stay was lifted, and that in November 2007 a date be set for a status conference which would include the

---

**15.** In fact at lease one case suggests this is not a basis for refusing to apply the abstention doctrine (*see C. Sterling Wolfe v. State Farm Fire & Casualty Insurance, supra,* 46 Cal. App.4th at p. 568, 53 Cal.Rptr.2d 878.)

**16.** The Special Master also notes that no authority is cited regarding application of the doctrine of primary jurisdiction that would prevent Plaintiffs from suing *the City* if it is not properly enforcing its sign regulations.

parties and the City. At that time either Judge Conti or the Special Master can reevaluate whether the City has effectively begun enforcement of its' sign regulations.[17] Also at that time a determination can be made as to whether the stay should remain in place, the case should be dismissed, or that the evidentiary hearing regarding the 25 signs (reduced to approximately 18 by actions of both parties) be resumed, briefed and concluded.[18]

## III. *The Release Agreement*

On December 15, 2003, Plaintiffs entered into a Purchase and Sale Agreement with Defendant CBS Corporation.[19] Pursuant to that Agreement, Defendant CBS paid Plaintiffs $2 million in exchange for seven outdoor advertising signs. The parties also entered into a written Release Agreement, which provided that Plaintiffs released Defendant CBS from "any and all causes of action ... arising from or relating to the conduct of business by [CBS] ... including but not limited to the maintenance and operation of any advertising structures and advertising displays in the City ... *as well as the permitting and compliance with the requirements of such permits for any and all such advertising structures and displays."* (Emphasis added.) The Release also provided that Plaintiffs would not sue any of CBS' employees, including Defendant Roche.

■ The interpretation of a release is governed by the same principles applicable to any other contract (*General Motors Corp. v. Sup.Ct.* (1993) 12 Cal.App.4th 435, 443, 15 Cal.Rptr.2d 622.) Defendants CBS and Roche argue that under ordinary principles of contract interpretation the Release bars all of the claims set forth in Plaintiffs' Complaint.

First, Defendants argue the language of the Release is *clear and unambiguous,* evidencing the parties' intent to bar *all* claims arising out of the maintenance, operation and permitting of CBS' outdoor advertising signs.[20] Defendants argue that the allegations in Plaintiffs' Complaint which form the basis for their interference, antitrust, nuisance and unjust enrichment claims, are all based on the operation, maintenance and permit status of Defendants' signs, which they argue is exactly the subject matter addressed by the Release.

Second, Defendants argue that at the time the parties executed the Release they were aware of the Clear Channel case *and made specific reference to it, i.e.,* the Release *specifically* refers to the case *by name* and states Plaintiffs will not commence litigation that is similar in any way to this case.

The Special Master agrees with Defendants that under ordinary principles of contractual interpretation it appears that

**17.** Plaintiffs have attempted to subpoena City records regarding the in lieu permit process, inventory processing and enforcement status. Both the City and Clear Channel object to the subpoena. At the March 22nd hearing the Special Master informed the parties that a recommendation regarding this matter would be considered separately, after Judge Conti had determined whether to adopt the Special Master's Report and Recommendation.

**18.** It appears to the Special Master that only a day or two of testimony is required to

complete the hearing as to the 25 signs at issue.

**19.** Plaintiffs have sued CBS Corporation, which is an indirect parent of CBS Outdoor Inc. CBS Outdoor Inc. owns and operates the outdoor advertising signs in the San Francisco metropolitan area. CBS Outdoor Inc. was formerly Viacom Outdoor Inc.

**20.** Additionally, the Release specifically included reference to California Civil Code section 1542, which allows for release of unknown claims.

the intent of the parties was to prevent Plaintiffs from initiating a suit like the present one. As Defendants argue, this is made particularly evident by reference to the Clear Channel case in the Release language. However, Plaintiffs attack the validity of the Release Agreement itself. They argue that the Release is *void and unenforceable* because it attempts to exculpate Defendants from willful conduct in violation of Civil Code Section 1668.

Section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

In reply, Defendants, citing *Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441 and *Madison v. Superior Court* (1988) 203 Cal.App.3d 589, 250 Cal.Rptr. 299, argue that Section 1668 is inapplicable because the statute only applies to "contracts of public interest." Furthermore, Defendants argue that the case law has limited the application of Section 1668 to "new" or "future" conduct.

Plaintiffs, citing *Health Net of Cal., Inc. v. Department of Health Services* (2004) 113 Cal.App.4th 224, 6 Cal.Rptr.3d 235 and *Capri v. L.A. Fitness Intern., LLC* (2006) 136 Cal.App.4th 1078, 39 Cal.Rptr.3d 425, argue that since the *Tunkl* decision the courts have made it clear that a party cannot contract away liability for his fraudulent or intentional acts, or for his negligent violation of statutory law, regardless of whether the public interest is involved. Plaintiffs further allege that "continuing" acts by Defendants create a "new" cause of action each time Defendants contract with an advertiser for its outdoor signs, and that these "new" causes of action are not covered by the Release.

Before addressing the application of Section 1668, the Special Master will address Plaintiffs' allegations that Defendants have engaged in "new" conduct not covered by the Release. The Special Master finds this argument unpersuasive. Pursuant to Proposition G, passed in March 2002, Defendants can no longer erect new outdoor signs, and thus any dispute between Plaintiffs and Defendants involving outdoor signs in the City was fixed at the time the parties signed the Release in December 2003. Furthermore, Defendants did not agree in the Release to cease its' advertising sign business. If that had been the Plaintiffs' intent the Release could have so provided. Accepting Plaintiffs' argument would mean that Defendants paid them to release only those acts that pre-dated the Release, and that the Release did not remove the threat of further legal action against Defendants in conducting the very same business with the very same outdoor signs after the date of the Release. As Defendants argue, this could not have been the intent of the parties because it presents an illogical interpretation of the Release. Plaintiffs could not possibly have believed that Defendants' conduct would not continue after the Release was signed. A contract should not be interpreted so as to produce an absurd result, but one that is reasonable. (Civ. Code section 1643: "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties.") Thus the Special Master finds that Plaintiffs' argument that Defendants have engaged in "new" conduct not covered by the Release to be an unreasonable interpretation of the Agreement and contrary to the apparent intent of the parties.

As for Plaintiffs' argument regarding the application of Section 1668, the Special

Master acknowledges that some of the language in this provision on its face, as well as some of the cited cases, appear to be supportive of Plaintiffs' argument. Furthermore, Plaintiffs' argument that a contract need not involve the public interest in order to be in violation of section 1668 appears correct under the cases cited.

However, in his Tentative Ruling, the Special Master explained that upon further analysis of the case law in this area it appeared that section 1668 was *not* meant to apply to the present circumstances, *i.e.*, in which two businesses with equal bargaining power limit their future liability by executing a Release. At the March 22nd hearing Plaintiffs argued that the equality of the bargaining position factor was wholly irrelevant to the issue of the enforceability of the release for *intentional* wrongs. Plaintiffs' position, based largely on the *Health Net* and *Capri* cases,[21] is that under current law Defendants' intentional conduct can *never* be released under section 1668. The Special Master has further considered Plaintiffs' argument, but as will be explained below, finds them unpersuasive.

Turning first to the *Tunkl* decision, there the California Supreme Court held that exculpatory clauses relieving a party from the consequences of his or her own *negligence* were unenforceable when the public interest was involved. The Court described factors or characteristics which identified a transaction implicating the public interest: "(1) It concerns a business of a type generally thought suitable for public regulation. (2) The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. (3) The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least any member coming within certain established standards. (4) As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. (5) In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional fees and obtain protection against negligence. (6) Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." (*Tunkl v. Regents of University of California, supra,* 60 Cal.2d at pp. 98–101, 32 Cal.Rptr. 33, 383 P.2d 441, fns. omitted.)

However, in *Health Net,* the Appellate Court refused to read a "public interest" requirement into the *Tunkl* decision. There plaintiff health plan provider contracted with the defendant Department of Health Services to be one of two health plans providing managed care services to Medi–Cal patients in a particular county. However, in violation of Welfare & Institutions Code section 14087.305(j) and its implementing regulations, the defendant assigned all who failed to select a plan to the competing health plan. The plaintiff sued for damages, but the contract contained an exculpatory clause providing that any remedies for non-compliance with laws not expressly incorporated into the contract did not include money damages. The Court of Appeal held there can be no exemption from liability for a violation of law, regardless of whether the public interest is involved (*Health Net of Cal., Inc. v. Department of Health Services, supra,* 113 Cal. App.4th at p. 234, 6 Cal.Rptr.3d 235.)

---

21. Plaintiffs also cite to 1 Witkin, Summary 10th (2005) Contracts, section 660, p. 737.

A similar result was reached in *Capri v. L.A. Fitness Int'l, LLC* (2006) 136 Cal. App.4th 1078, 39 Cal.Rptr.3d 425. There a member of the defendant fitness club sued the fitness club for injuries he sustained when he slipped and fell on the club's pool deck. The Court of Appeal held that the plaintiff's action was not barred by the release clause in the membership agreement. The Court stated that the club was in violation of comprehensive statutes regulating swimming pools, and that these violations were the cause of plaintiff's injuries, and thus the release fell squarely within the explicit statutory prohibition against contractual exculpation for a violation of law and was invalid.

The court explained: "The court in *Tunkl* was concerned with the validity of an exculpatory clause to avoid responsibility for ordinary negligence." In such a case, *Tunkl* invalidates any exculpatory provision affecting the public interest. [Citation.] *Tunkl* did not, however, add a "public interest" requirement where the contract purports to avoid liability for fraud, willful injury, or violation of law, whether intentional or negligent. The plain language of section 1668 renders such exculpatory provisions invalid as against public policy, and nothing in *Tunkl* alters that. "It is now settled-and in full accord with the language of the statute-that notwithstanding its different treatment of ordinary negligence, under *section 1668,* 'a party [cannot] contract away liability for his fraudulent or intentional acts or for his negligent violations of *statutory* law,' regardless of whether the public interest is affected." (*Capri v. L.A. Fitness Int'l, LLC, supra,* 136 Cal.App.4th, 1084, 39 Cal.Rptr.3d 425.)

However, although no public interest requirement was critical to the holdings in *Health Net* and *Capri,* the Special Master notes that both cases would appear to independently meet the *Tunkl* factors, and the Court in *Health Net* so stated. Given that both *Health Net* and *Capri* are so factually distinct and involve different public policy concerns from the present case, suggests to the Special Master that regardless of whether the public interest factor is or is not present, a different result should be reached in this case.[22] As Defendants argue, the Release in question between Plaintiffs and Defendants was between two business entities with equal bargaining power, and not a consumer and a larger entity. The released conduct (Defendants' operation and maintenance of its advertising signs) was not only known to the parties but was the specific subject of the Release.[23] Indeed under similar circumstances courts have found section 1668 to be inapplicable (*Appalachian Ins. Co. v. McDonnell Douglas Corp.* (1983) 214 Cal. App.3d 1, 262 Cal.Rptr. 716; *CAZA Drilling (California), Inc. v. TEG Oil & Gas U.S.A., Inc.* (2006) 142 Cal.App.4th 453, 48 Cal.Rptr.3d 271.)

The *CAZA* case is particularly instructive both in its reasoning and historical analysis of the cases in this area. In *CAZA,* CAZA was hired by TEG to drill a well ("Yule 6".) A few days after drilling began, there was a blowout, resulting in the death of a CAZA employee, injury to others, and complete destruction of Yule 6.

---

**22.** Furthermore, the Special Master notes that just because a business is regulated, does not mean it is within the "public interest" or would necessary meet the *Tunkl* test (*Appalachian Ins. Co. v. McDonnell Douglas Corp.* (1989) 214 Cal.App.3d 1, 20, 262 Cal.Rptr. 716.)

**23.** The Special Master notes that the Court in *Health Net* the Court was concerned with releasing a party from responsibility for *future and unknown* statutory and regulatory violations (*Health Net of Cal., Inc. v. Department of Health Services, supra,* 113 Cal.App.4th at p. 224, 6 Cal.Rptr.3d 235.)

CAZA filed a complaint against TEG, alleging breach of contract and other causes of action. TEG filed a crosscomplaint seeking compensation for economic loss and physical harm to its equipment and facilities in connection with the drilling blowout. The trial court granted CAZA's summary judgment motion on the crosscomplaint based on an exculpatory clause in the drilling contract. On appeal, TEG argued that the exculpatory and limitation of liability provisions in the parties' agreement was invalid pursuant to section 1668 and the factors set forth in *Tunkl*.

The Appellate Court disagreed, stating: "Although the [*Tunkl*] Court did not specifically exclude contracts between relatively equal business entities from its definition of contracts in the public interest, it is difficult to imagine a situation where a contract of that type would meet more than one or two of the requirements discussed in *Tunkl*. With respect to the second and third factors, for example, CAZA did not hold itself out as performing services for the public, but only for the small number of entities that happened to be oil field operators. While the production of oil is of great importance to the public, the drilling of a particular oil well is generally only important to the party who will profit from it. With respect to the fourth and fifth factors, appellants' argument that it was forced into an adhesion contract boils down to this: "Although two provisions in the agreement were altered during negotiations, we did not know we could alter any provisions during negotiations." The fact that TEG found itself backed into a corner in late 2002 as a result of failure to plan ahead and had no choice but to deal with the only company that had a suitable drill rig available at that specific point in time, is not the sort of unequal bargaining power to which the court in *Tunkl* referred." (*CAZA Drilling (California), Inc. v. TEG Oil & Gas U.S.A., Inc., supra,* 142 Cal. App.4th at 468–469, 48 Cal.Rptr.3d 271.)

In so holding, the Appellate Court relied on the analysis in *Appalachian Ins. Co., supra,* 214 Cal.App.3d 1, 262 Cal.Rptr. 716. The *CAZA* Court explained *Appalachian Ins. Co* was also a case in which commercial entities tried to undercut contractual limitations on liability by reliance on *Tunkl*.

The Appellate Court explained: "In [*Appalachian Ins. Co.*] a rocket manufactured by defendant McDonnell Douglas Corp. failed to boost a communications satellite to the required orbit." As a result, the satellite had to be written off as a total loss. The insurers of the satellite owner sought to recoup their loss from McDonnell Douglas, contending that limitation of liability provisions in the parties' agreement were contrary to public policy. With regard to plaintiffs' argument that McDonnell Douglas's services were open to any member of the public and provided a service of great importance to some members of the public, the court stated: "[T]he provision of space hardware and launch services is of practical necessity to no individual member of the public; it is of 'practical necessity' only to a few, very large commercial and governmental entities dealing in highly specialized fields such as telecommunications." (*Appalachian Ins. Co. v. McDonnell Douglas Corp., supra,* 214 Cal. App.3d at 29, 262 Cal.Rptr. 716.) Further, "all [sales] were to large, sophisticated commercial and governmental entities." (*Id.* at p. 30, 262 Cal.Rptr. 716.) With regard to the supposedly " 'essential nature' " of the services, the court stated: "*Tunkl's* focus was on whether the service was 'essential' to individual members of the public. Here, the service is 'essential' only to a small number of large corporations and governmental entities; it 'is not a compelled, essential service' but 'a voluntary relationship between the parties.' [Citation.] Finally, this case does not involve a 'decisive advantage of bargaining

strength [used] against any member of the public who seeks [the] services.' (*Tunkl, supra,* 60 Cal.2d at p. 100, 32 Cal.Rptr. 33, 383 P.2d 441) This case does not involve a large entity using its bargaining strength against an individual member of the public. This case involves two large, sophisticated corporations with relatively equal bargaining power who negotiated the terms of a voluntary agreement." (*Ibid.,* fn. omitted.) (*CAZA Drilling (California), Inc. v. TEG Oil & Gas U.S.A., Inc., supra,* 142 Cal. App.4th at 468-469, 48 Cal.Rptr.3d 271.)

The Appellate Court concluded: "The same is true here. CAZA's services may have been essential to TEG, but the agreement between the parties did not implicate the public interest in the way required to abrogate exculpatory provisions limiting liability for negligence under *Tunkl.*"

Next the Court addressed the *Capri* and *Health Net* decisions, distinguishing both cases: "If *Tunkl* were the only basis raised by appellants for the applicability of section 1668, we could end our analysis. However, in their cross-complaint and their opposition to the motion for summary judgment, appellants contend that CAZA violated various statutes and regulations in performing drilling activities. They argue that section 1668 invalidates any exculpatory language that would relieve CAZA of liability for performing drilling operations in violation of law "without regard to whether any public interest [was] involved." They cite for support this court's recent decision in *Capri v. L.A. Fitness International, LLC* (2006) 136 Cal.App.4th 1078, 39 Cal.Rptr.3d 425 (*Capri* )."

The Appellate Court explained: "*Capri* is significantly different from the present case because it involved personal injury to a consumer." Here, the contract was between two business entities and the damages claimed are entirely economic. In only one recent case has a court applied section 1668 to invalidate provisions in a contract between business entities: *Health Net of California, Inc. v. Department of Health Services* (2003) 113 Cal.App.4th 224, 6 Cal.Rptr.3d 235 (*Health Net* ).

However, the Court found the holding in *Health Net,* as with *Capri,* to be distinguishable. "[T]he exculpatory clause at issue in [*Health Net* ]" "prohibit[ed] . . . the recovery of *any damages at all* for DHS's statutory or regulatory violations" and "exempt[ed] DHS *completely* from responsibility for completed wrongs." [Citation.] The court believed that even in a commercial case, "an exculpation of any liability for *any* damages for *any* statutory violation surely rises to the level of an 'exempt[ion] from responsibility' within the meaning of the plain language of section 1668." [Citation.] The provisions at issue here do not exempt CAZA from all liability, but merely limit its responsibility with respect to economic damages. The court in *Health Net* expressly declined to decide whether "*some* contractual limitations over the scope of available remedies" would "necessarily run afoul of section 1668."

The Special Master finds that the facts and reasoning of the *Appalachian Ins. Co* and *CAZA* cases not only more closely resemble this case, but are persuasive. Presumably two business entities with equal bargaining power should be able to voluntarily enter into a Release Agreement whereby one pays the other in order to continue its' allegedly wrongful conduct. The conduct thus ceases to be wrongful as against the party who received consideration under the Release. This does not appear to the Special Master to be the sort of Agreement that was meant to run afoul of Section 1668, and is clearly distinguishable from the facts of the cases cited by Plaintiffs in which the parties signed broad contracts releasing new, unknown and unspecified wrongdoing that might happen in the future—i.e. in *Health Net* the contract

included an exculpatory provision releasing the defendant from damages for *any* violation of statutory or regulatory law not made part of the parties' contractual obligations, and in *Capri* the plaintiff similarly signed a contract with a broad exculpatory clause for unknown future conduct.

The Special Master acknowledges that no case directly supports his conclusion,[24] but as explained above, a contrary conclusion would suggest that in many instances parties would be unable to settle a case because one party, for consideration, would not be allowed to release the other for its' wrongful conduct against that party. The Special Master finds that an interpretation of section 1668 which would stifle such settlements is unreasonable, and perhaps is why there is no case directly on point.

In other words, the Special Master finds that when two parties settle a case and a consideration is given in which a plaintiff allows a defendant to continue on with its' alleged wrongful conduct, that conduct is no longer wrongful, at least as to that particular defendant. Plaintiff in exchange for consideration is permitting that conduct to go forward in the future. The Special Master further notes out that the type of settlement described above occurs in other contexts, *i.e.*, intellectual property cases, patent infringement cases and contamination of property cases.[25] For example, a Plaintiff sues a Defendant for patent infringement. Defendant admits wrongful conduct but in exchange for a payment of money Plaintiff gives Defendant a license. What was once wrongful conduct is now permitted. This is no different than our present situation where Plaintiff agreed in a business negotiation and for consideration to allow Defendants' alleged illegal signs to continue to be displayed. This does not violate or implicate Civil Code section 1668.

Thus the Special Master recommends a finding that that the Release Agreement would appear to bar all of Plaintiffs claims against Defendants CBS and Roche. However, in addition, as set forth below, an independent ground for dismissal rests on the basis that Plaintiffs have failed to allege sufficient facts to establish their causes of action for unjust enrichment, intentional interference with a business relationship, nuisance and antitrust violations.

### IV. *Unjust Enrichment*:

Plaintiffs' cause of action for "unjust enrichment" is based on the allegation that whenever Defendants successfully lease their illegal signs, they receive the unjust benefit of lease payments taken from a pool of funds which is intended for and should be flowing to Plaintiffs' legally maintained signs. Plaintiffs argue the term "benefit" connotes *"any* type of advantage" and relief is available under an unjust enrichment theory whenever the circumstances show that as between two individuals it is unjust for the person receiving the benefit to retain it.

In his Tentative Ruling, the Special Master, as he had before, found Plaintiffs' allegations insufficient to state a cause of action for unjust enrichment.[26] At the March 22nd hearing, Plaintiffs agreed that they would not contest the Special Mas-

---

**24.** Several cases related to this issue are currently pending before the California Supreme Court.

**25.** Finally, the Special Master notes that nothing is to prevent another plaintiff or governmental entity from suing a party such as CBS for its wrongful conduct.

**26.** As set forth above, the Special Master earlier recommended that Plaintiffs attempt to amend their complaint against Clear Channel to add a cause of action for unjust enrichment be denied. Such recommendation was adopted and so ordered by the Court.

ter's recommendation. For the benefit of the Court, explained below is the Special Master's basis for the recommendation.

First, Plaintiffs cannot state a claim for unjust enrichment because no such cause of action exists in California. Unjust enrichment is not a separate cause of action but is tied to other causes of action. (*Melchior v. New Line Productions, Inc.* (2003) 106 Cal.App.4th 779, 131 Cal. Rptr.2d 347; *Enreach Tech., Inc. v. Embedded Internet Solutions, Inc.* (N.D.Cal. 2005) 403 F.Supp.2d 968, 976; *McKell v. Washington Mutual, Inc.* (2006) 142 Cal. App.4th 1457, 1490, 49 Cal.Rptr.3d 227.)

As the court in *Melchior* explained: "The phrase 'Unjust Enrichment' does not describe a theory of recovery, but an effect: the result of a failure to make restitution under circumstances where it is equitable to do so." (*Lauriedale Associates, Ltd. v. Wilson* (1992) 7 Cal.App.4th 1439, 1448, 9 Cal.Rptr.2d 774.) *"Unjust enrichment is 'a general principle, underlying various legal doctrines and remedies,' rather than a remedy itself."* (*Dinosaur Development, Inc. v. White* (1989) 216 Cal. App.3d 1310, 1315, 265 Cal.Rptr. 525.) It is synonymous with restitution. (*Id.* at p. 1314, 265 Cal.Rptr. 525.) (*Melchior v. New Line Productions, Inc., supra,* 106 Cal.App.4th at p. 793, 131 Cal.Rptr.2d 347; *emphasis added.*)

Or, as stated recently in *McKell v. Washington Mutual, Inc.* (2006) 142 Cal. App.4th 1457, 49 Cal.Rptr.3d 227: "There is no cause of action for unjust enrichment. Rather, unjust enrichment is a basis for obtaining restitution based on quasicontract or imposition of a constructive trust. (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, §§ 1015, 1016, pp. 1104–

1105.)" (*Id.* at p. 1490, 49 Cal.Rptr.3d 227.)

Second, as set forth above, unjust enrichment is founded on principles of restitution. As Defendants argue, *even if* unjust enrichment existed as a cause of action, Plaintiffs have not plead sufficient facts to maintain the action, because it requires a plaintiff plead facts establishing that he is seeking return of something he paid directly to the defendant (*First Nationwide Sav. v. Perry* (1992) 11 Cal.App.4th 1657, 1662, 15 Cal.Rptr.2d 173; Rest., Restitution, § 1.[27]) Plaintiffs have failed to plead they paid any money or gave any property to any Defendants which such Defendant now unjustly retains.

In their briefing Plaintiffs, relying on *County of Solano v. Vallejo Redevelopment Agency* (1999) 75 Cal.App.4th 1262, 90 Cal.Rptr.2d 41, argued that Defendants view of restitution is too narrow, and that it is not essential that money be paid directly to the recipient by the party seeking restitution.

Plaintiffs' reliance on *County of Solano* is misplaced. In *Solano* the money at issue was specifically earmarked for the County, but used by the City. The decision accurately reflects the principle that restitution exists for the purpose of restoring the status quo by returning to a plaintiff funds in which he or she has an ownership interest. This is to be contrasted with Plaintiffs' claim for the advertising revenue that Defendants receive through their contracts with advertisers, and in which Plaintiffs have no ownership interest. (*See Korea Supply v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1149, 131 Cal.

---

**27.** Specifically Comment "b" to Section 1 provides: "A person confers a benefit upon another *if he gives to the other possession of or some other interest in money, land, chattels, or choses in action,* performs services beneficial to or at the request of the other, satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage." (*Emphasis added.*)

Rptr.2d 29, 63 P.3d 937 (lost profits are not recoverable as restitution because competitors have no ownership interest in profits sought).)

Therefore, for the reasons stated above, the Special Master finds that Plaintiffs have failed to state a claim for which relief may be granted. The Special Master recommends that Plaintiffs *not* be given leave to amend their Complaint against Defendants, because it appears to the Special Master that under no circumstances could Plaintiffs allege sufficient facts to state a claim for unjust enrichment.

## V. *Intentional Interference with Prospective Economic Advantage*

The Special Master finds Plaintiffs cause of action for intentional interference with prospective economic advantage is deficient for two separate reasons. First, it appears to be *time barred* because Plaintiffs have not alleged that Defendants engaged in any conduct within the applicable statute of limitations.

The statute of limitations for the tort of intentional interference with prospective economic advantage is *two years* (Cal.Code Civ. Proc. section 339(1); *Knoell v. Petrovich* (1999) 76 Cal.App.4th 164, 168, 90 Cal.Rptr.2d 162.) Plaintiffs filed this Complaint on August 3, 2006, and thus Plaintiffs cannot state a viable claim for relief for intentional interference with prospective economic advantage unless the alleged conduct arose on or after August 3, 2004.

However, the allegations of interference contained in Plaintiffs' Complaint are either not time specific, or stem from sales which occurred *prior* to May 2004. Furthermore, although Plaintiffs attempt to plead around this problem by alleging "ongoing transactions," they fail to identify any particular transaction with which Defendants interfered within the requisite two year period.

Plaintiffs alternatively argue that Federal Rule of Civil Procedure 8(a)[28] does not require allegations of specific acts of interference and simply requires that a claimant make a "short and plain statement" of his claim showing that he is entitled to relief.

The Special Master finds Plaintiffs' argument unpersuasive. As discussed below, a critical element of this tort is the existence of an identifiable economic relationship between a plaintiff and a third party which contains a probability of future benefit to the plaintiff. The cases hold that vague allegations are insufficient. Plaintiffs fail to point to any authority which states that Rule 8(a) excuses this pleading requirement. In fact in the case cited by Plaintiffs, *Davis v. Olin* (D.Kan. 1995) 886 F.Supp. 804, the Court goes on to state that a plaintiff is still required to "set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," and furthermore, "[Rule 8(a)] still requires minimal factual allegations on those material elements that must be proved to recover." (*Id.* at p. 808.)

Second, even if the claim was not time barred, Plaintiffs' Complaint fails to allege all of the necessary elements of the tort.

---

**28.** Rule 8(a) states: A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks. Relief in the alternative or of several different types may be demanded.

"The elements of a cause of action for interference with prospective economic advantage are: (1) an economic relationship between the plaintiff and a third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional and wrongful conduct designed to interfere with or disrupt this relationship; (4) interference with or disruption of this relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's wrongful conduct." (*Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 241, 26 Cal.Rptr.3d 798 citing *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153–1154, 131 Cal.Rptr.2d 29, 63 P.3d 937.)

Plaintiffs' allegations regarding the first element are particularly weak. The first element requires that the economic relationship be a *specific, existing relationship* out of which the probability of economic benefit exists. However, Plaintiffs do not allege a single economic relationship in the "mini-zip code markets" where Defendants allegedly illegal signs compete with their signs, nor do they allege they were not able to expand existing relationships or develop additional relationships. Rather Plaintiffs point to relationships with historic customers and allege they would have a reasonable expectation for future economic benefit with these customers but for Defendants' conduct.[29] The Special Master finds that such allegations are insufficient under applicable case law.

In *Westside Center Assocs. v. Safeway Stores 23 Inc.* (1996) 42 Cal.App.4th 507, 49 Cal.Rptr.2d 793, the plaintiff Westside sued the defendant Safeway for interference with prospective economic advantage allegedly caused by the defendant's closing its anchor supermarket in the center, removing the fixtures, and then exercising an option to renew the lease for five years, allegedly with the intent to drive down the price of the center so the defendant could buy it at an artificially low price. The plaintiff claimed that the defendant interfered not with a particular sale, but with the plaintiff's "opportunity" to sell the property for its true value.

The Court of Appeal held that the plaintiff's "interference with the market" allegation failed to provide any factual basis upon which to determine whether the plaintiff was likely to have actually received the expected benefit. The Court found that without an existing relationship with an identifiable buyer, the plaintiffs expectation of a future sale was at most a "hope" for an economic relationship and a desire for future benefit. Thus, plaintiff's "interference with the market" theory of liability, by itself, was insufficient as a matter of law to show plaintiff had an economic relationship with a prospective buyer which was reasonably likely to produce a future beneficial sale of its property.

The Court explained: "Where a contract exists, it identifies the particular interest with which the defendant has allegedly interfered and hence serves to establish both the fact and the amount of the plaintiff's resulting damages. For similar reasons, the sort of 'expectancies' the law typically protects are those of future contractual relations. [Citation.] 'In such cases there is a background of business experience on the basis of which it is possible to estimate with some fair amount of success both the value of what has been lost and the likelihood that the plaintiff would have received it if the defendant had

---

**29.** However, the Special Master notes that the only authority cited by Plaintiffs for this proposition is an out of state case—(*Walsh v. Irvin Stern's Costumes* (E.D.Pa.2006) 2006 WL 2380379.)

not interfered.' (Prosser & Keeton, The Law of Torts, *supra*, § 130, p. 1006; *see also* 2 Harper *et al.*, The Law of Torts (2d ed. 1986) § 6.11, p. 345.) Nonetheless, the chance the expectancy otherwise would have occurred is necessarily a matter of some uncertainty. The law precludes recovery for overly speculative expectancies by initially requiring proof the business relationship contained 'the *probability* of future economic benefit to the plaintiff.'" [Citations.] "'Although varying language has been used to express this threshold requirement, the cases generally agree it must be reasonably probable that the prospective economic advantage would have been realized but for defendant's interference.'" (*Westside Center Assocs. v. Safeway Stores 23 Inc.*, *supra*, 42 Cal.App.4th at p. 522, 49 Cal.Rptr.2d 793.)[30]

Similarly in *TPS Utilicom Servs., Inc. v. AT & T Corp.* (C.D.Cal.2002) 223 F.Supp.2d 1089 the Court stated: "An allegation of interference with a *potential* customer is too speculative to state a claim for interference with prospective economic advantage." [para.] [TPS's] complaint alleges no more than interference with potential customers with which TPS has no existing relation. ("TPS had a valid and enforceable expectation of an economic relationship with thousands of consumers residing in markets *it plans to serve*.") TPS misplaces the law's emphasis on expectations: an expectation of an economic relation is not actionable. Rather, an expectation of economic advantage based on an ongoing economic relationship is required. "TPS has not stated a claim for interfer-

ence with prospective economic advantage." (*Id.* at p. 1106.)

Here Plaintiffs fail to allege a specific economic relationship with any particular ad agency or advertiser with which it has an existing economic relationship and with which Defendants have interfered. Their allegations at most express the hope for a future economic relationship. In other words, Plaintiffs' allegations consist of general allegations of interference with the outdoor advertising market generally, but fail to allege an existing, concrete relationship with a specific and identifiable advertiser or agency with which any of the Defendants interfered. Such allegations are insufficient to satisfy the first element of a cause of action for interference with prospective economic advantage.

The Special Master also finds Plaintiffs have failed to make sufficient allegations with respect to the remaining elements of the tort. For example, the second element requires that Defendants have knowledge of the existing economic relationship. However, Plaintiffs make general allegations that Defendants were aware of Plaintiffs' relationship with major national ad agencies, and that such agencies would not place ads on Defendants' sign if they knew they were not legally permitted.[31] But Plaintiffs fail to allege that Defendants knew of any *specific* existing relationship with a particular ad agency with which a Defendant interfered.

The third and fourth elements require that Plaintiffs plead and prove intentional acts designed to and which actually disrupt a specific, existing relationship. However,

---

**30.** Plaintiffs attempt to distinguish *Westside Center* by arguing that there the economic relationship being alleged was *Westside Center's* relationship with the entire market of all possible but as yet identified buyers for its property, and here the Complaint names three outdoor advertising agencies with which Plaintiffs have historically sold advertising space. While true, this does not excuse

Plaintiffs from the requirement that the plead relationships must be *more than an expectation.*

**31.** Plaintiffs also allege that Roche, as CBS's Northern California District General Manager and most knowledgeable employee was aware of Plaintiffs' relationship with major national agencies.

here too Plaintiffs make general allegations that Defendants' acts diverted part of the advertising market from Plaintiffs, but fail to allege any link between these alleged acts and any design or disruption of an existing economic relationship.

Finally, the fifth element requires that Plaintiffs allege they have sustained damages proximately caused by Defendants alleged interference with an existing relationship. However based on the pleadings the harm Plaintiffs allege, *e.g.*, depressed rates at which Plaintiffs signs have been sold in the past—could just as readily been caused by market conditions than by any intentional act of Defendants.

In his Tentative Ruling the Special Master found that Plaintiffs had failed to state a claim for intentional interference with prospective economic advantage and that this cause of action be dismissed. The Special Master further recommended that Plaintiffs be given one final opportunity to amend the Complaint to plead a *specific* economic relationship that was interfered with *within the two year statute of limitations.* At the March 22nd hearing the Plaintiffs did not contest this recommendation. Although the Special Master is prepared to make his tentative ruling his final recommendation, it must be emphasized that Plaintiffs, if they choose to amend, must specifically plead the elements of this cause of action as explained outlined above, and if Plaintiffs fail to do so, the Special Master recommends that this cause of action also be dismissed without leave to amend. Furthermore, if the Court finds the Release bars all claims against Defendants CBS and Roched, this cause of action may only be amended as to the remaining Defendants.

VI. *Claim for Public and Private Nuisance*

The Special Master initially notes that Plaintiffs' previous attempts to state a cause of action for public and private nuisance have been unsuccessful. In January 2003, in ruling on Defendant's Motion to Strike Plaintiffs' Amended Complaint, Judge Conti dismissed Plaintiffs' nuisance claim. Judge Conti stated that while "[n]uisances are broadly defined ... the definition is not inclusive of all types of injury," and normally involved some type of "physical interference." Judge Conti acknowledged that a city ordinance may designate an activity as a per se public nuisance, but a plaintiff must still allege some "special injury" arising out of the nuisance. Judge Conti concluded that the harms Plaintiffs had alleged, *i.e.*, that Defendants' conduct skews the rental market for advertising space, is unrelated to a nuisance because this activity does not interfere in any physical way with the use of their property. In addition, Judge Conti ruled that even if the signs did constitute a per se public nuisance; Plaintiffs had not alleged some "special injury" arising out of the nuisance. Plaintiffs were *not* given leave to amend.

In December 2005, the Special Master reached a similar conclusion when he ruled on Plaintiffs' Motion for Leave to file a Third Amended Complaint. Again Plaintiffs were *not* given leave to amend. In his Tentative Ruling, the Special Master found that Plaintiffs' most current attempt to set forth a nuisance claim suffered from the same flaws as previously set forth by the Court and Special Master. At the March 22nd hearing, Plaintiffs argued that their leasehold interest is a real property right and if it loses value, due to decreased rental income from Defendants' nearby illegal signs, this economic impact is sufficient to state a cause of action for nuisance—i.e. no physical interference is required. The Special Master agrees with Plaintiffs that a holder of a leasehold interest may maintain an action for nuisance, but finds no merit in Plaintiffs'

"economic impact" argument. Thus the Special Master still finds that Plaintiffs have failed to state a cause of action for nuisance.

Plaintiffs' present Complaint again alleges causes of action for *both* public and private nuisance. First, Plaintiffs' allege that the *per se* nuisance created by Defendants illegal signs is a *public* nuisance concerning *aesthetics and safety,* per the City Planning and Building Code.[32]

Second, Plaintiffs allege that Defendants' continuing maintenance of its' illegal signs constitutes a *private* nuisance, because the maintenance of said signs interferes with Plaintiffs' property rights as leaseholders of their signs in the relevant markets. As stated above, Plaintiffs are arguing that the use and enjoyment of their leased signs depends entirely on their ability to generate cash flow from those signs, and to the extent that Defendants' illegal signs prevent Plaintiffs from realizing that cash flow, Defendants are interfering with Plaintiffs present ability to use and enjoy their property.

Finally, in their briefing Plaintiffs also argued that the alleged nuisance does have a *physical* component, *i.e.,* sight obstruction or "clutter," which directly involves sensory perception. Plaintiffs' somewhat novel theory rests on the claim that the interference stems from the visual proximity of the illegal signs to their legal signs. Plaintiffs argue that this visual clutter "is to the eyes, what loud music is to the ears, and is no less a sensory perception than noxious fumes are to the nose." Plaintiffs also use this visual clutter theory to argue that *res judicata* and collateral estoppel principles are not applicable because these are newly discovered facts, *i.e.,* that this

concept of clutter was first discovered in May 2006.

As set forth in *Newhall Land & Farming Co. v. Superior Court* (1993) 19 Cal. App.4th 334, 23 Cal.Rptr.2d 377: "Civil Code section 3479 defines a nuisance as '[a]nything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property ....' A nuisance may be a public nuisance, a private nuisance, or both (*Venuto v. Owens–Corning Fiberglas Corp.* (1971) 22 Cal.App.3d 116, 124, 99 Cal.Rptr. 350.) 'A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal.' (Civ.Code, § 3480.) Every other nuisance is private. (Civ.Code, § 3481.) '[A] private person may maintain an action for a public nuisance, if it is *especially* injurious to himself, but not otherwise.' (Civ.Code, § 3493.)" (*Newhall Land & Farming Co. v. Superior Court, supra,* 19 Cal.App.4th at p. 342, 23 Cal.Rptr.2d 377; emphasis added.)

As with Plaintiffs' previous nuisance claim, the Special Master finds this one suffers from the same defect, *i.e.,* it lacks an allegation of any sort of *physical* interference. Plaintiffs' attempt to allege "new facts" and that the nuisance does have a physical component, *i.e.,* that the illegal signs are some sort of "clutter," the Special Master finds unconvincing. It appears to the Special Master that Plaintiffs must have been aware of the factual underpinnings of its clutter theory prior to May

**32.** Plaintiffs' argument is based on Section 611(f) which provides that the City deems a prohibition on all new advertising signs is necessary because the increased size and number of general advertising signs in the

City can distract motorists and pedestrians creating public safety hazards, and because the advertising signs contribute to blight and visual clutter as well as the commercialization of public spaces within the City.

2006, particularly since no new outdoor advertising signs have been erected in the City since the passage of Proposition G in 2002. Thus the Special Master finds that Plaintiffs cannot simply use a new term ("clutter") to describe an already existing condition, and then argue it creates a "new fact" upon which to base a nuisance claim.[33]

Furthermore, the Special Master does not find that Defendants' sales of ads on its signs and purported representations as to the legal status of those signs are an interference to the use and enjoyment of Plaintiffs property. Plaintiffs allege no physical interference, obstruction, damage or diminution of enjoyment of their property, or that Plaintiffs' signs are obscured.

Furthermore, a private person may maintain an action for a public nuisance, if it is *specially* injurious to himself, but not otherwise. However, in alleging the right to bring a public nuisance as a private plaintiff, Plaintiffs do not allege a separate injury. Rather Plaintiffs appear to be alleging a separate nuisance from that affecting the public. The public nuisance alleged by Plaintiffs which affects the public is one that concerns "aesthetics and safety." In contrast, the private nuisance alleged by Plaintiffs is one of "clutter," which prevents it from placing certain advertising on its signs. However, this is not a special injury flowing from the aesthetics and safety of Defendants' signs, and thus does not appear to support a private nuisance claim.

Furthermore, Plaintiffs' argument that Defendants' signs, by their mere presence interfere with Plaintiffs' ability to sell advertising space and thus make a profit, does not constitute nuisance. "The essence of a private nuisance is an interference with the use and enjoyment of land"

and "... without it, the fact of personal injury, or of interference *with some purely personal right*, is not enough for such a nuisance." (Prosser on Torts) (3d ed.) p. 611 and fn. 91 at p. 611 (*Venuto v. Owens–Corning Fiberglas Corp., supra*, 22 Cal. App.3d at pp. 124–125, 99 Cal.Rptr. 350; emphasis added).

Therefore the Special Master recommends that in light of the history of prior dismissals Plaintiffs' nuisance claim be dismissed *without leave to amend*.

## VII. *Antitrust Allegations*

Plaintiffs' antitrust claim stems from their allegation that Defendants' illegal signs result in an increase in the supply of advertising space in the City, thus driving down advertising prices. Plaintiffs further argue they have adequately pleaded all the other requisite elements to establish a claim for monopolization or attempted monopolization pursuant to Section 2 of the Sherman Antitrust Act. In his Tentative Ruling the Special Master found, for the reasons set forth below, that Plaintiffs had failed to establish their antitrust claim. At the March 22nd hearing Plaintiffs did not contest the Special Master's Tentative Ruling.

To state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must prove: (1) possession of monopoly power in the relevant market; and (2) willful acquisition or maintenance of that power (as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident.) To state an attempt to monopolize claim a plaintiff must prove: (1) the defendant had specific intent to control prices or destroy competition; (2) the defendant engaged in predatory or anticom-

---

**33.** Given this conclusion, the Special Matter believes that principles of collateral estoppel and/or *res judicata* may constitute separate grounds for barring Plaintiffs' present nuisance claim.

petitive conduct to accomplish the monopolization; and (3) a dangerous probability of the defendant achieving monopoly power. In addition, both monopoly and attempted monopoly claims must allege the requisite antitrust injury (*Pacific Express, Inc. v. United Airlines, Inc.* (9th Cir.1992) 959 F.2d 814, 817.)

The Special Master finds that both Plaintiffs' monopoly and attempted monopoly antitrust allegations fail to set forth the requisite elements of these claims. First, Plaintiffs fail to allege how two companies (Clear Channel and CBS) who Plaintiffs allege each have 47.5% of the market, could possess *monopoly* power. By definition, neither could be a monopolist because they have an *equal* share of the market. At best Plaintiffs have alleged an *oligopoly*. However, Section 2 of the Sherman Act does not punish behavior aimed at creating or maintaining oligopolies. "To pose a threat of monopolization, one firm *alone* must have the power to control market output and exclude competition. [Citation.] An oligopolist lacks this unilateral power. By definition, oligopolists are interdependent. An oligopolist can increase market price, but only if the others go along." (*Rebel Oil Co., Inc. v. Atlantic Richfield Co., Inc.* (9th Cir.1995) 51 F.3d 1421, 1442–1443, *cert. denied* 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995); *see also U.S. v. Syufy Enterprises* (9th Cir. 1990) 903 F.2d 659, 664 ["There is universal agreement that monopoly power is the power to exclude competition or control prices."].) As Defendants argue, because Clear Channel and CBS are both major competitors in the outdoor sign market, each could undersell the other should one raise prices to a "supra competitive" level. Thus, the Special Master finds that Plaintiffs have not alleged possession of monopoly power by the Defendants.

Second, Plaintiffs fail to allege a defined *market*. In fact Plaintiffs allege two different relevant markets-outdoor advertising in the City generally, and outdoor advertising in the "mini-zip code markets." Plaintiffs argue pleading alternative markets is sufficient because the process of defining a relevant market is a factual inquiry for the jury, citing (*High Technology Careers v. San Jose Mercury News* (9th Cir.1993) 996 F.2d 987, 990.)

The Special Master finds *High Technology Careers* to be distinguishable. As Defendant Clear Channel points out in its' Reply Briefing, *High Technology Careers* did not address *pleading* requirements. Rather it was a case denying the defendant's summary judgment motion on the issue of market definition because both the plaintiff and the defendant in *High Technology Careers* had proposed relevant markets, and the Court held it could not determine which market definition was applicable as a matter of law. However, here Plaintiffs cite no authority supporting their argument that it is permissible to allege alternative geographic markets in their complaint and rely on the finder of fact to work out the details of those markets later.

In addition, the market allegations are vague and conclusory. For example, the Special Master finds that Plaintiffs fail to adequately describe what they mean by a "mini zip code market." The Sherman Act requires a *clear* definition (*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.* (9th Cir.1991) 924 F.2d 1484, 1490.) Furthermore, a market definition sufficient to withstand a motion to dismiss consists of two specific elements. A plaintiff must plead the "product market" and the "geographic market." (*Los Angeles Memorial Coliseum Commission v. N.F.L.* (9th Cir.1984) 726 F.2d 1381, 1392; *cert. denied,* 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984).) Plaintiffs have failed

to adequately define either relevant market.[34]

Finally, the Special Master finds that the most critical flaw in Plaintiffs' antitrust allegations is that they fail to plead an *antitrust injury*, which is a critical element to both a monopolization and attempted monopolization claim. Plaintiffs' Complaint alleges that Defendants' illegal signs have improperly increased the supply of advertising signs in the City, enabling Defendants to offer volume discounts and package deals, driving *down* the price of selling advertising space on City signs. Plaintiffs further allege that Defendants' advertising prices in the City are *lower* than prices for other markets.

"The antitrust injury doctrine *of Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); and *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers. (*Isaksen v. Vermont Castings, Inc.,* 825 F.2d 1158 (7th Cir.1987); *Local Beauty Supply, Inc. v. Lamaur, Inc.,* 787 F.2d 1197 (7th Cir.1986);" *Chicago Prof. Sports Ltd. P'ship v. National Basketball Ass'n* (9th Cir.1992) 961 F.2d 667, 670, *cert. denied,* 506 U.S. 954, 113 S.Ct. 409, 121 L.Ed.2d 334.) According to Plaintiffs' allegations, it appears that consumers are presently actually better off because the acts of Defendants which Plaintiffs object to neither reduce output nor raise prices,

*i.e.,* the acts of Defendants appear to be pro-competitive.[35]

In other words, it appears to the Special Master that Plaintiffs' allegations appear to show at most injury *to them*. However, the antitrust laws were enacted for "the protection of competition not competitors" (*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.* (1977) 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701.) "[P]rivate plaintiffs can be compensated only for injuries that the antitrust laws were intended to prevent. [*Id.*] To show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition [Citation.] If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal *per se*" (*Rebel Oil Co., Inc. v. Atlantic Richfield Co., Inc.* (9th Cir.1995) 51 F.3d 1421, 1443.)

The Special Master finds that the relief Plaintiffs seek actually appears contrary to the principles of antitrust jurisprudence. If one assumes Plaintiffs are correct in their allegation that Defendants' signs are illegal and result in an increased supply and lower pricing, than eliminating these signs from the market place will actually restrict competition and cause prices to rise. In other words, even assuming Defendants are selling advertising space on improperly permitted signs, this does not result in injury to competition but at most injury to Plaintiffs.

---

**34.** Alternatively Plaintiffs seek leave to amend to clarify its allegations (*see* Plaintiffs' Opposition Brief p. 14, fn. 8.)

**35.** This also applies to Plaintiffs' argument that the "antitrust injury" consists of advertising consumers not getting what they paid for,

because they would not pay for advertising space on Defendants' signs if they knew they were illegal, *i.e.,* they are paying something for nothing. However, this is not an antitrust injury because this alleged harm has not decreased output nor raised prices. As explained *infra,* this at most harms Plaintiffs.

Finally, in their Opposition Brief, Plaintiffs for the first time attempt to set out a new claim against Defendants pursuant to the Unfair Practices Act, California Business and Professions Code Section 17000, *et seq.* It appears to the Special Master that this attempt by Plaintiffs to add a new claim without amending their Complaint is improper, and thus should not be entertained. If Plaintiffs plan to allege this claim, they should amend their pleadings accordingly. However, it also appears to the Special Master that such amendment would be futile, because like their federal antitrust claims, Plaintiffs must be able to allege, along with the other requirements for maintaining an unfair practices claim, an injury to competition (*Kentmaster Manufacturing Co. v. Jarvis Products Corp.* (9th Cir.1998) 146 F.3d 691, 695) ["To prove a predatory pricing claim under Robinson–Patman requires the same showing of unfair, anti-competitive pricing required to prove a claim under section 2 of the Sherman Act."] However, as set forth above, Plaintiffs have failed to plead a cognizable antitrust injury. Thus the Special Master recommends that Plaintiffs' antitrust claim be dismissed without leave to amend.[36]

## SUMMARY OF RULING

1. *Clear Channels' motion to dismiss:* The Special Master recommends that Clear Channel's motion to dismiss Plaintiffs' 2002 lawsuit against it based on the doctrine of abstention be denied. The Special Master further recommends that the Court, as in its original Order of April 11,2003, continue to stay the action pursuant to the doctrine of primary jurisdiction until a date set by the Court in November 2007, at which time the City's enforcement of its sign ordinance can be reevaluated.

Although the Special Master will defer to the judgment of the Court, it is also recommended that the stay apply to the 25 signs for which Judge Conti lifted his earlier stay. If after the November 2007 hearing the Special Master decides to recommend concluding the hearing as to the 25 signs, this matter can be done within the two to four month period following the hearing.

2. *Defendants CBS and Roches' Motion to Dismiss:* Although the Special Master finds no case which is exactly on point, for the reasons explained above the Special Master recommends a finding that that the Release Agreement appears to bar all of Plaintiffs' claims against Defendants CBS and Roche.

3. *Nuisance, unjust enrichment and violations of the antitrust laws:* Even assuming the Release is not valid as to Defendants CBS and Roche, the Special Master finds that Plaintiffs have failed to state causes of action against any of the Defendants for nuisance, unjust enrichment or violations of the antitrust laws.

4. *Intentional interference with an economic relation:* The Special Master recommends that Plaintiffs be allowed to amend their complaint regarding their cause of action for intentional interference with an economic relation. However, assuming the Court finds the Release as to Defendants CBS and Roche to be valid, this action only remains viable as to Defendant Clear Channel. Furthermore, although the Special Master recommends that Plaintiffs be given one *final* opportunity to amend the Complaint, Plaintiffs must plead a specific economic relationship

---

**36.** The Special Master finds that if the problem with Plaintiffs' antitrust claim was only in alleging a relevant market, leave to amend might be considered. However the Special Master's rationale for denying leave to amend is that it appears that Plaintiffs do not and cannot allege an antitrust injury.